**In the Matter of Petition**

**for Naturalization of DANIELE ANNE ELISE ROSE LaVOIE**

Petition No. 2429

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 24, 1972

HONORABLE WILLIAM M. DARLINGTON, *for Petitioner*

YOUNG, *Judge*

### MEMORANDUM OPINION

YOUNG, *District Judge*

Petitioner, a national of France and the wife of a United States citizen, filed a petition for naturalization under section 319(a) of the Immigration and Nationality Act ("the Act"). 8 U.S.C.A. § 1430(a) (1970). This permits the spouse of a citizen to be naturalized after residing continuously in the United States for three years.[1] Another

---

[1] This section provides in pertinent part:

> "Any person whose spouse is a citizen of the United States may be naturalized . . . if such person immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least three years . . . and has been physically present in the United States for periods totaling at least half of that time. . . ."

section defines "continuous" residence and specifies that an absence of one year will break the continuity.[2] 8 U.S.C.A. § 1427(b) (1970). The application of these sections to the facts of this case raises the novel question whether Petitioner may be naturalized despite her failure to have spent the full, unbroken three year term in this country. She was absent solely in reliance upon faulty information from Immigration and Naturalization Service ("the Service"). For the reasons set forth below I hold that she may be naturalized.

The facts of this case are not in dispute. Petitioner and her husband, Donald E. LaVoie, a native-born United States citizen, were married in Puerto Rico in 1965. Some six months later, Petitioner was formally admitted for permanent residence. In 1968, her husband was transferred to Dakar, Senegal, to serve three years as a Deputy Director of the Peace Corps. On several occasions, the LaVoies inquired with the Service to determine whether petitioner could accompany her husband to Senegal without jeopardizing her application for citizenship. They were assured that this was permissible, and, in reliance upon this information, the couple left the United States for the period from November 2, 1968 to August 31, 1971.

After they had been abroad for more than a year, Donald LaVoie wrote the Service and requested instructions on the next steps to be taken. The letter he received in reply was misleading on two counts. First, it did not mention the only means whereby Petitioner was then eligible for naturalization, which was by application for accelerated procedures under section 1430(b) as the spouse of a citizen posted abroad in the employment of

---

[2] This section provides in pertinent part:

"...

"Absence from the United States for a continuous period of one year or more during the period for which continuous residence is required for admission to citizenship . . . shall break the continuity of such residence. . . ."

the United States Government. For such persons, all residency requirements are waived. Petitioner need only have flown to the United States for the naturalization itself, but she would have to have done this while her husband was still stationed abroad. The letter, however, erroneously assumed that Petitioner could remain eligible under the normal three-year residency standard of section 319(a). The Service therefore enclosed an Application to Reserve Residence, which maintains legal continuity of residence for aliens stationed abroad in specified occupations deemed to be of benefit to the United States.[3] This special provision, however, is not available to the spouse of the person so employed. For this reason Petitioner's Application to Reserve Residence was subsequently denied.[4] She therefore appeared wholly ineligible for naturalization, since she had been absent over a year and was still not informed of the alternative processes under section 1430(b). Matters remained in this posture until the LaVoies returned to the United States and the opportunity to use the accelerated procedure had passed. This petition was then filed on March 23, 1972.

Throughout these attempts to gain citizenship the LaVoies' diligence and good faith are unquestioned. The exhibits include several letters seeking information and requesting the proper procedures to follow. Testimony at the preliminary investigation mentioned other inquiries which have not been preserved. Donald LaVoie further testified, and the Naturalization Examiner found, that only the misinformation from the Service caused his wife's apparent failure to comply with the Act. Had the couple been fully informed, Petitioner would not have left the United States until she had been naturalized, or else they

---

[3] See 8 U.S.C.A. § 1427(b) (1970).

[4] The Application was also denied on the alternative ground of not being timely filed; apparently the LaVoies had received no instructions on this point.

would have accepted the expense of having her fly back from Dakar to take advantage of section 1430 (b) naturalization.

■■ Under these circumstances I believe that Petitioner's petition for Naturalization must be granted. Two separate reasons support this conclusion, and will be discussed in sequence. First, I do not believe that an absence from the country in reliance upon Service misinformation will break "continuous" residence within the intent of the Naturalization Statute. And secondly, I believe that the Government is in any event estopped to object to a technical noncompliance which one of its agents was materially responsible for creating.

## I.

■ At the outset, it is clear that the requirements for naturalization should not be whittled away by loose statutory construction. On several occasions the Supreme Court has pointed out that the Naturalization Act extends a privilege, and that the statutory prerequisites must therefore be strictly complied with. See Maney v. United States, 278 U.S. 17 (1928) (Holmes, J.) (naturalization court may not accept the certificate of arrival nunc pro tunc); United States v. Ness, 245 U.S. 319 (1917) (Brandeis, J.) (same); United States v. Ginsberg, 243 U.S. 472 (1917) (hearing in chambers inadequate substitute for hearing in open court) (alternative ground).

This general stringency underlies a legislative desire to have the residency requirements observed with particular strictness. That desire is illustrated by the Congressional response to the decision in Neuberger v. United States, 13 F.2d 541 (2nd Cir. 1926) (1. Hand, J.). At the time of that case the Act required five years of continuous residence for naturalization, but did not specify any particular period of absence as breaking its continuity. Neu-

berger had been visiting his native Germany in 1914 when he was overtaken by the First World War, and was unable to return until its termination. The Second Circuit held that since the prolongation of his sojourn was involuntary he had never abandoned his "residence" in the United States. This result must have appeared troublesome to Congress. As the Court admitted, it would be possible for an alien to be naturalized under these circumstances without having spent any of the preceding five years in this country. It would therefore be difficult to find character witnesses, and the petitioner would be denied the assimilative experiences which it was one purpose of the waiting period to secure. We may speculate that these considerations helped prompt the amendment of the Act three years later. The Act of March 2, 1929, § 6(b), 45 Stat. 1513, specified that "[a]bsence from the United States for a continuous period of one year or more during the period immediately preceding the date of filing the petition for citizenship . . . shall break the continuity of such residence." This was not an isolated episode; subsequent legislation underscored Congress' intention that the residence periods be strictly observed. The Act of June 25, 1936, 49 Stat. 1925, specified with some precision the persons who would be excepted from the one-year absence provision—certain government employees and persons engaged in research and foreign commerce—and this exception was quite rigidly contained by the Act of June 29, 1938, 52 Stat. 1247.

Subsequent judicial interpretation of "continuous residence" has been correspondingly strict. Two cases denied naturalization to persons who had voluntarily left the country but whose prompt return was delayed by circumstances beyond their control. See In re Holzer's Petition, 143 F.Supp. 153 (S.D.N.Y. 1956); In re Hilden, 60 F.Supp. 845 (S.D.N.Y. 1945). In the latter case the

reasons for delay were unspecified, and in the former they included financial constraints, so these decisions may have included some concept of "assumption of the risk." Nonetheless the Second Circuit has termed a year's absence "an absolute bar" to naturalization. United States v. Larsen, 165 F.2d 433, 434 (2nd Cir. 1947).

I believe, however, that the better view permits some flexibility in the assessment of Congressional purpose. Several cases have permitted deviation from the residency requirements where external forces—including Government rulings—rendered fruitless the petitioners' good-faith attempts at compliance. In re Yarina, 73 F.Supp. 688 (N.D. Ohio 1947), granted citizenship to an alien who was captured at Wake Island in 1941 and forcibly transported by the Japanese to a concentration camp, holding that this absence from the country should not be considered disbarring within the intention of the statute. Another case granted section 1430(b) accelerated naturalization to the wife of an overseas serviceman who was willing to promptly join her husband in Thailand and was precluded from doing so solely because this area was designated a combat zone in which all dependents were forbidden. See Petition for Naturalization of Silvia Martinez Simpson, 315 F.Supp. 584 (W.D. La. 1970); Petition for Naturalization of Sun Cha Tom, 294 F.Supp. 791 (D. Hawaii 1968).

Quite in point for the present case is McLeod v. Peterson, 283 F.2d 180 (3rd Cir. 1960), which also involves the effect of prior error by the Service. McLeod, a citizen of the British West Indies, had been living illegally in the United States with his American wife. He was discovered and threatened with deportation in 1956. At that time he was eligible to petition the Attorney General for a suspension of deportation, since under the predecessor to 8 U.S.C.A. § 1254(a) he had been in the country over

five years. The Service, however, persuaded him to relinquish this right and leave voluntarily, promising that they would help his wife secure his lawful admission on a non-quota basis which would be "fairer" to other citizens of the British West Indies competing for the limited number of places open. McLeod's wife became fatally ill the following year, however, and he illegally entered the country to visit her. He was again apprehended and deportation proceedings again begun. McLeod once more petitioned for a suspension, which the Service this time declined to forward to the Attorney General on the grounds that McLeod had not now been in the country for five years. The Third Circuit, however, held that the petition was properly brought. McLeod's absence had been assured by the Service's unwillingness to forward his prior petition, but their motivating concern for the integrity of the quota policy was not within their jurisdiction. Hence McLeod's departure had been brought about by improper persuasion, and "the nature of his absence was such as not to interrupt the continuity of his presence within the meaning of the statute." Id. at 182.

The case sub judice is properly governed by McLeod. Petitioner's absence was similarly occasioned by incorrect or misleading Service instructions. Here also the circumstances of her absence do not suggest the kind of abuses which Congress was presumably trying to forestall when it first enacted the limitation on absences. Petitioner's attachment to the principles of this country is not called into question by her departure. Nor was she foregoing a period of acculturation since she was living with her citizen-husband during the time she was abroad. This Court therefore holds that Petitioner maintained a continuous residence for purposes of section 319 (a) of the Act.

This conclusion is supported by the liberal construction given to other terms in the Act where it has appeared necessary in the interests of justice and the fair assessment of legislative intent. For example, 8 U.S.C.A. § 1251(a)(4) provides that an alien may be deported if he is convicted of a crime involving moral turpitude "within five years after entry." The definition of "entry" is obviously important since it begins the period within which he is liable to this additional penalty. The first cases construed the language literally and held that any return from a foreign country would start the period running anew. See, e.g., United States v. Smith, 289 U.S. 422 (1933). Subsequent cases, however, declined to apply the statute where the circumstances of departure from the United States were merely fortuitous and a literal reading would therefore be unfair. In Delgadillo v. Carmichael, 322 U.S. 388 (1947), for example, an alien seaman had entered a foreign country solely as a result of his ship being torpedoed. The Court reasoned that Congress could not have intended to add the perils of deportation to the ordinary perils of the sea. Similar conclusions were reached in Savoretti v. United States, 214 F.2d 314 (5th Cir. 1954); Schoeps v. Carmichael, 177 F.2d 391 (9th Cir. 1949); and Yukio Chai v. Bonham, 165 F.2d 207 (9th Cir. 1947).

Congressional intent has been divined with similar flexibility in cases involving naturalization benefits for aliens who enlisted in the armed forces during periods of conflict. 8 U.S.C.A. § 1440(a) provides for naturalization of aliens who enlisted, while in the United States or certain specified territories, during the time of the Vietnam hostilities. A predecessor statute similarly provided for the Korean War. The courts have seen in these measures a policy of rewarding especially useful service and have extended the sections to analagous circumstances not within their literal terms.

See, e.g., In re Petition of Rogue, 339 F.Supp. 339 (S.D. Miss. 1971) (extension of enlistment); In re Gabriel, 319 F.Supp. 1312 (D. Puerto Rico 1970) (extension of enlistment while in Puerto Rico); Villarin v. United States, 307 F.2d 774 (9th Cir. 1964) (enlistment before the statutory period of hostilities began); In re Torres, 240 F.Supp. 1021 (D. Ariz. 1965) (original enlistment outside the United States and subsequent re-enlistment after the statutory period).

## II.

Alternatively, we also find for petitioner on the basis of an estoppel theory. Indeed, this result follows from the course of the statutory construction just outlined. Petitioner must prevail once prior official statements have been found misleading to some specified standard of materiality; and thereafter any Government protest based upon the letter of the Act will be unavailing. The practical result is the same as if the Government were estopped by its conduct to raise the point at all. However, the convenience of utilizing the developed concepts of estoppel is such as to justify making explicit their application in this context.

A party may be subject to equitable estoppel if it makes a materially misleading statement which the other party relies upon to his detriment. For reasons to be discussed below, courts have been reluctant to find this concept applicable to the federal government and have generally avoided use of the term. In the Immigration and Naturalization field, however, there are three categories of cases which appear to tacitly rely on estoppel concepts.

The first are those cases holding that a plaintiff should be restored to the position he would have occupied if he had not received incorrect advice from the Service. They include Hetzer v. Immigration & Naturalization Service,

420 F.2d 357 (9th Cir. 1970), and Tejeda v. Immigration & Naturalization Service, 346 F.2d 389 (9th Cir. 1965). In the latter case a Philippine citizen had been entitled to enter the United States under a special statutory provision, but let the time limit expire after the American Consul erroneously said that "there was nothing he could do for him." The Ninth Circuit held that if the plaintiff had otherwise been qualified for entry he was further entitled not to be entrapped. Although this opinion was based on an unelaborated statement that to hold otherwise would be "unjust", by precluding the government from relying on the consequences of its earlier misstatements it seems to draw heavily on estoppel theory.

The second group of cases impose a special burden of proof on the government when it opposes a declaratory judgment of citizenship brought by one whom it has given reason to believe that he *is* a citizen. The means by which this impression was created may vary. See Lim v. Mitchell, 431 F.2d 197 (9th Cir. 1970) (findings of Board of Special Inquiry); Lee Hon Lung v. Dulles, 261 F.2d 719 (9th Cir. 1958) (same); Delmore v. Brownell, 236 F.2d 598 (3rd Cir. 1956) (letter from the Service). None of these means has the conclusiveness of a formal adjudication; but in each case the plaintiff relied upon the determination, made his home here, and established all the ties and roots of permanent citizenship. Realizing the seriousness of undoing these ties, courts have required the government to meet the same standard used in denaturalization cases —that of "clear, unequivocal and convincing evidence," see Baumgartner v. United States, 322 U.S. 665 (1944). But these do not seem best understood as burden-of-proof opinions, since the courts were heavily influenced by factors which are central to estoppel theory but otherwise of more marginal relevance. In all three cases the court stressed that the plaintiff had lived here many years in

140

reliance upon the Service ruling, with an implication that if there had been little reliance then the standard of proof would be different. Moreover, in Lim the court also noted that if there had been any fraud it was committed by the plaintiff's father or grandfather, through whom he claimed derivative citizenship. It conceded that the plaintiff himself acted in good faith—a factor that again seems more relevant to estoppel than to burden of proof.

Finally there is the Supreme Court opinion in Moser v. United States, 341 U.S. 41 (1951), which was ostensibly decided on principles of waiver. Moser, a Swiss national, claimed exemption from the draft as an alien during World War II. At that time the Selective Service Act contained a provision that any alien claiming this privilege would be permanently barred from citizenship. Moser nonetheless claimed it in the understanding that by the Treaty of 1850 this penalty could not be applied to Swiss citizens. He was confirmed in this belief by his own legation, the State Department, and Selective Service officials. He therefore submitted an application for exemption which struck out the sentence explicitly waiving the opportunity of becoming a citizen. When his petition for naturalization was nonetheless denied the Supreme Court reversed on the ground that "elementary fairness" requires "nothing less than an intelligent waiver here." Id. at 556. Yet estoppel again appears to be the underlying concept. The Selective Service Act was absolute in terms and would appear to have prohibited the naturalization of all persons so little attached to this country, without reference to whether they fully understood the consequences of their act. What probably made waiver necessary in this case is the fact that Moser had been affirmatively misled by two agencies of the government, and would have joined the Armed Forces had he not been informed that to do so was unnecessary to citizenship.

In holding the government similarly estopped to challenge Petitioner's residency period I am aware that estoppel is involved against the sovereign only with great reluctance. The reasons underlying this general policy are sound ones but do not appear applicable to the case at hand. Rather they reflect a concern for preserving the government's continued power to take general action in the public welfare. Thus it has been held that non-enforcement of a law creates no valid expectation of continued non-enforcement, State v. Ward, 361 Mo. 1226, 239 S.W.2d 313 (liquor regulation); and that passive acquiescence by the authorities does not preclude subsequent challenge to activity which is then determined to be unlawful. See, e.g., Missouri v. Illinois, 180 U.S. 208 (state officials; improper upstream sewage discharge); United States v. County of San Francisco, 310 U.S. 16 (1940) (federal officials; misuse of conditional land grant); Utah Power & Light Co. v. United States, 243 U.S. 389 (1917) (federal officials; encroachment on public lands). Estoppel is invoked frequently and with little success in tax cases, where the taxpayer seeks to hold the Internal Revenue Service to an early ruling. However, in most cases a reversal of opinion does not seem unjust; the taxpayer is simply called upon for sums which should have been paid all along. See, e.g., Walker-Hill Co. v. United States, 162 F.2d 259 (7th Cir. 1947), cert. denied, 332 U.S. 771. And where the taxpayer has changed his location or procedures in reliance on the earlier ruling, see, e.g., In re Hooper's Estate, 5 V.I. 518 (3rd Cir. 1966), it may still be argued that the public interest in maintenance of the fisc overbears the individual interests involved.

I believe, however, that the present case stands on a different footing for three reasons: (1) An estoppel in favor of Petitioner will operate to the benefit of only a single individual; no general public function or property

is jeopardized. (2) Petitioner does not seek to take advantage of governmental inaction, but instead relied on its advice in good faith and to her actual detriment. Cf. Nager Electric Co. v. United States, 396 F.2d 977 (Ct. Cls. 1968). (3) Had she been properly informed, Petitioner would certainly have brought her application within the letter of the law. Utah Power and County of San Francisco, supra, which held that the government may not be estopped if the initial agreement made by its agents was not authorized by law, are thus distinguishable on several grounds. The private parties in those cases had entered into illegal courses of action which were of substantial benefit to themselves and detrimental to public properties, and sought to preserve their position by creating an estoppel based upon a period of government acquiescence.

Ultimately it seems just that the government not be exempt from estoppel in all circumstances. See Pomeroy, Equity Jurisprudence, 801–21 (5th Ed.). This conclusion was well illustrated in the case of Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775 (Fla. 1956) (en banc). There a state agency claimed title to the increment to an artificial island in Biscayne Bay, on a theory of sovereign title to the original seabed, despite the fact that the site had been made available for dumping spoil earth from a much-needed public work at the specific request of another governmental agency. The Florida Supreme Court held the government estopped to claim title, id. at 789–90, and went on to say:

"While [equitable estoppel] is not applied against the State or its subdivision as freely as against an individual, there is no doubt that it may be invoked ever against the exercise of governmental powers where it is necessary to prevent manifest injustice and wrongs to private individuals, provided that the restraint placed upon such governmental body to accomplish such purpose does not interfere with the exercise of governmental power."

In conclusion we would like to express our thanks to William M. Darlington, the Designated Naturalization Examiner in this case. His exceptional care and diligence were of great assistance to both the LaVoies and this court.

A decree will be entered granting the petition for naturalization.