Ronald G. NOVAK, Jr., MM3, United States Navy, No. 272–58–7813, and Gary David Bowie, MM3, USN, 553–04–0229, Petitioners,

v.

Donald RUMSFELD, Secretary of Defense, et al., Respondents.

No. C–75–2438, WHO.

United States District Court, N. D. California.

March 31, 1976.

gram. In this era of a volunteer military establishment, modern contract principles apply to military enlistment contracts. *Peavy v. Warner,* 493 F.2d 748 (5th Cir. 1974); *Matzelle v. Pratt,* 332 F.Supp. 1010 (E.D.Va.1971). As with any private party, the Navy must fulfill its contractual promises and must be straightforward in its contractual dealings. In recruiting, the Navy must accurately inform prospective enlistees of both the available educational-training opportunities and the stringent qualifying criteria for these attractive programs. Without this candid appraisal of the benefits as well as the burdens, the Navy cannot expect to foster credibility among prospective recruits. Without candid disclosure and a commitment to follow through on recruitment promises, a volunteer Navy cannot function. Above all other contracting parties the Government must be held to its promises.

In the instant case, I find that the Navy failed to adequately inform petitioners of the rigorous program requirements, and failed to fulfill its contractual obligation to place petitioners in the Nuclear Field Training Program. Accordingly, under both contract law and the Navy's own regulations, petitioners, Novak and Bowie, are entitled to discharge from their entire military obligations.

Julie Kesler-Goeltz, Marjory A. Kaplan, Richmond, Cal., for petitioners.

James L. Browning, Jr., U. S. Atty., Stephen A. Shefler, Asst. U. S. Atty., San Francisco, Cal., for respondents.

## OPINION

ORRICK, District Judge.

Petitioners, Ronald G. Novak and Gary D. Bowie, are currently enlisted in the United States Navy for terms of six years. By petitioning for a writ of *habeas corpus* they seek to be discharged, alleging that the Navy has materially breached its contractual obligation by failing to place petitioners in a Nuclear Field Training Pro-

### I

Novak and Bowie first contacted Navy recruiters in November 1974 and December 1974, respectively. After taking some preliminary screening tests, both men were told they would be eligible for the Navy's Nuclear Field Training Program. The recruiters told petitioners that the commercial value of this training course ranged from $70,000 to $85,000. Both men were told that the Nuclear Field Training Program consisted of preliminary assignment to "boot camp", Navy "A" School, and ship duty. Petitioners were told that after completion of these preliminary training phases the enlistees in the Nuclear Field Training Program entered the specialized training

course consisting of a six-month Nuclear Power Fundamentals Course and six months of prototype practical training. Novak was also told that enlistees in the program generally attended a preschool refresher course before actually beginning the Nuclear Power Fundamentals Course, but that the preschool course was solely for the benefit of the recruits. Bowie was not even told of the preschool placements.

Both men were told that in order to qualify for the advanced training in the Nuclear Power Fundamentals Course and the prototype training they must maintain excellent military records at the earlier phases of their training and must graduate in the upper two-thirds of their Navy "A" school class. Both men, attracted by the promises of extensive training in the nuclear field, enlisted in the Navy.

In order to be considered for the Nuclear Field Training Program, the petitioners each signed a four-year enlistment contract as well as a two-year extension agreement, and a Nuclear Field Statement of Understanding.[1] The extension agreements made it clear that the purpose of enlisting for the additional two years was to become eligible for the Nuclear Field Training Program. The agreement stated that the only promise made in exchange for enlistment for the additional two years was placement in the Nuclear Field Training Program. The extension agreement also provided that the agreements could not be cancelled once an enlistee accepted accelerated advancement to an E–4 rating, whether or not nuclear power advanced training was completed. The Statement of Understanding reiterated what the men had been told concerning eligibility for the Nuclear Field Training Program. It provided that:

"To remain eligible for the one year formal nuclear training, personnel must continually display excellent military per-

formance and demonstrate the academic potential to complete Nuclear Power School by standing in the upper two-thirds of their basic 'A' School class."

The Statement of Understanding did not mention academic excellence at preschool as a prerequisite. Indeed, it did not even mention preschool as a required part of the training program.

After enlisting, petitioners were both assigned to "boot camp", "A" school, and ship duty. They both accepted accelerated advance to an E–4 grade. They both maintained fine military records, and both graduated in the upper two-thirds of their "A" school classes. Petitioners were then assigned to the six-week refresher preschool course which entailed a review of basic algebra, trigonometry, and elementary physics. Both petitioners experienced scholastic difficulties in the preschool course and scored below average in their academic work. After completing five weeks of the six-week preschool course, petitioners were dismissed from the Nuclear Field Training Program due to their poor academic performance. Petitioners were then transferred to Treasure Island where they were assigned to clerical work. Upon dismissal from the Nuclear Field Training Program both petitioners requested discharges from the Navy. Their requests were denied.

## II

I find that the Navy, by removing petitioners from the Nuclear Field Training track prior to their entry into the Nuclear Power Fundamentals Course, materially breached the enlistment contracts. Petitioners enlisted and signed their extension agreements because they were promised valuable training opportunities in the nuclear field. Their Navy recruiters encouraged them to join the programs and told them they had excellent potential. Although pe-

---

1. Although petitioner Novak signed his four-year enlistment contract and entered the Navy CACHE program on December 4, 1974, and did not sign his two-year extension agreement until December 30, 1974, he was told that enlistment in the CACHE program would accelerate his entry into the Navy and would help insure his placement in the Nuclear Field Training Program. Novak's purpose in enlisting initially and in signing the extension agreement was to pursue the Nuclear Field Training Program. Entry into this specialized training program did not come as an afterthought following his December 4, 1974, enlistment.

titioners fulfilled the academic and conduct prerequisites required by their contracts as set forth in their Statements of Understanding, instead of the promised high-powered advanced training in theoretical physics and mathematics, they received only the most basic of training and never were enrolled in the Nuclear Field Training Program. It is undisputed that regular Navy enlistees, who are not in the Nuclear Field Training Program and who have not signed enlistment extension agreements, would also receive the "boot camp", "A" school, and ship training given to petitioners. It is also undisputed that petitioners' additional training of a preschool refresher course has no commercial training value in a job market. The preschool course is taught by the regular Nuclear Power Fundamentals Course instructors in their free time and does not burden the Navy with additional training costs. The meager benefits bestowed on petitioners do not come close to the training opportunities promised them upon enlistment. The benefits received were not the motivating force for petitioners' four-year enlistments or their two-year extension commitments.

█ Although their extension agreements stated they were noncancellable once the enlistee had accepted an accelerated E–4 rating, whether or not the advanced training was completed, this did not mean that the contracts were noncancellable once the E–4 ratings were accepted if, as here, the enlistees were not given the opportunity to even *begin* the advanced phase of their training. It should be noted that although the accelerated E–4 rating entitles an enlistee to an early pay increase, the total monetary gain of an accelerated E–4 rating over an E–4 rating obtained on an unaccelerated basis is $1,874 over the six-year term. Both common sense and the uncontroverted affidavits of petitioners make it clear that the accelerated receipt of this relatively modest sum was merely a fringe benefit for petitioners and was not

the inducement to join the Navy for a six-year term.

Since petitioners failed to receive the benefits they contracted for, and since the Navy materially breached its part of the bargain, petitioners are entitled to a release from their military contracts. *Peavy v. Warner, supra.*

Indeed, the Navy's own regulations provide that petitioners are entitled to discharge. The applicable regulations dealing with cancellation of enlistment contracts provide:

> "If a member is disenrolled from a Special Program for any reason prior to his entry into the advanced training phase as defined below, he may submit a request to the Chief of Naval Personnel for cancellation of his Agreement to Extend Enrollment and/or active duty agreement." BUPERSMAN § 10503002.-b.1.[2]

and that an extension agreement shall be cancelled:

> "[W]hen a member, through no fault of his own, has failed to receive *any of the benefits* for which the extension was executed." BUPERSMAN § 1050150.9c (emphasis added).

Here petitioners have not received *any* of the benefits of the advanced training. This case is unlike the situation in *Nixon v. Secretary of Navy*, 422 F.2d 934 (2d Cir. 1970), where the Second Circuit in construing the same Navy regulations held that an enlistee in the Nuclear Field Training Program was not entitled to discharge from the Navy once he had completed his Nuclear Power Fundamentals Course as well as several months of submarine prototype duty and then discovered that submarine life did not suit him. In the *Nixon* situation, Judge Anderson pointed out, and I think properly, that the petitioner had already received quite a few of the training benefits he had contracted for in enlistment. Here, in contrast, neither Novak nor Bowie ever began the Nuclear Power Fun-

---

**2.** BUPERSMAN means Bureau of Naval Personnel Manual and is the abbreviation commonly used by the Navy.

damentals Course and neither petitioner began the advanced training of the Nuclear Field Training Program, which was the benefit for which they had contracted. Petitioners, not having received *any* of the training benefits for which they had contracted, are entitled to discharge.

The petitions for *habeas corpus* are granted.