Richard J. SANTOS

v.

CDR James FRANKLIN, Commander, Naval Reserve Readiness Command, Region Four, and Rear Admiral C. J. Seiberlich, Chief of Naval Personnel.

Civ. A. No. 80–0230.

United States District Court,
E. D. Pennsylvania.

June 12, 1980.

Alan M. Lerner, Philadelphia, Pa., for petitioner.

Gary Tilles, Asst. U. S. Atty., Philadelphia, Pa., for respondent.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Petitioner Richard J. Santos, a member of the United States Naval Reserve, seeks a writ of habeas corpus ordering his release from active duty in the United States Navy. Petitioner was called to active duty for a period of sixteen months under the authority of 10 U.S.C. § 673a because he failed to attend the requisite number of training drills. Petitioner challenges his activation as a violation of his contractual and consti-

tutional rights. Alternatively, he claims that the Navy unlawfully denied his request for a hardship discharge. In addition to habeas corpus relief, petitioner seeks damages against two Navy officers for their allegedly unlawful conduct.[1] I will grant the writ and dismiss the claim for damages.

### I.

The parties originally submitted this case for decision on cross-motions for summary judgment based on a documentary record consisting primarily of petitioner's service record. I denied the motions. Upon review of the record, it was clear that although the parties agreed upon the predicate facts, they sharply disputed the inferences to be drawn from them on several important issues, thereby precluding summary judgment. A hearing was then held at which the petitioner was the only witness. The Navy introduced petitioner's service record and certified copies of pertinent Navy regulations. The following opinion constitutes my findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

Navy regulations required Santos to attend or be excused from ninety percent of forty-eight regularly scheduled training drills, or forty-three drills each year while in the Reserve. See BuPerInst 5400.42E ¶¶ 302–04. This requirement is applied on a rolling basis so that a reservist is subject to recall at any time he has accounted for less than forty-three meetings in the preceding year. At the time of his recall, Santos had attended or had been excused from only forty-two drills in the preceding twelve months. Santos admits that he fell short of the requirement, but maintains that he did so in reliance on an official Navy document that stated the annual drill requirement to be forty rather than forty-three drills. Petitioner signed this document, called a "Statement of Acknowledgement," on May 1, 1979. At that time Santos was still capable of complying with the drill requirement. All now concede that the figure given in the May 1 "Statement of Acknowledge-

ment" was erroneous, but Santos asserts that he believed the figure to be correct and relied upon it.

Santos enlisted in the Navy on October 18, 1974 under the Ready Mariner Program, which permitted him to serve most of his military obligation as a drilling reservist. He was trained as a Hospitalman and released to the Naval Air Reserve Unit at Lakehurst, New Jersey as a grade E–2 Hospitalman Apprentice on May 25, 1975. For the next several years he maintained a satisfactory drill attendance record. Beginning in September 1978, however, his attendance fell off and from December 1978 through March 1979 Santos attended no drills. It appears that these absences were due to family problems, in particular the illness of his father in Baltimore.

Santos was informed by letter dated March 1, 1979 from the Commanding Officer, Naval and Marine Corps Reserve Center, West Trenton, New Jersey that his prior absences would "be disregarded for drill monitoring purposes." Exactly why this wholesale excuse was granted is not clear, but it seems that Santos was not given notice of his missed drills as required by Navy regulations. The effect of the excuse was to give Santos full credit for six months of drills, or a total of twenty-four, even though he had actually attended only six of them. For the remainder of the year, Santos attended eighteen drills and missed six, bringing his total at the time he was recalled to forty-two attended or excused drills for the year. As of May 1, however, Santos had accumulated only four absences and was thus still capable of satisfying the correct drill requirement.

The parties agree that Santos was informed of his drill obligation several times before he signed the May 1 "Statement of Acknowledgement." All of the following documents are part of Santos's service record:

(1) 9/17/74. A month before his enlistment Santos signed a "Statement of Understanding" which stated that he was

1. Although the Department of the Navy is not a party to this action, the respondents are herein-after sometimes referred to collectively as the "Navy."

required to attend ninety percent of all scheduled reserve training drills. The document did not say how many drills were scheduled or how many Santos would have to attend nor did it mention excused absences. The document did state, incorrectly, that if Santos failed to meet the drill requirement he could be recalled to active duty "for a period not to exceed 45 days in any one year."

(2) 10/18/74. On the day of his enlistment Santos signed a "Statement of Acknowledgement" identical in format to the May 1, 1979 statement. This document stated, again incorrectly, that Santos was "require[d]" to attend forty-eight drills annually. No mention was made of excused absences or a percentage attendance requirement.

(3) 3/6/76. Santos received a form letter which stated: "You are required to attend at least 90% of regularly scheduled drills for your unit training and pay category, i.e. TCAT 'A' = 48, TCAT 'B' = 24." The actual number of drills required or absences permitted does not appear nor is the designation "TCAT" explained.

(4) 7/6/76. Santos received a form notice of two missed drills for the previous month. Taking a completely different approach, the notice simply stated that "on the occasion of missing the 6th drill" Santos would be activated unless the absence was excused.

(5) 3/1/79. Santos was notified that his prior absences would be "disregarded." The letter went on to say that he would still be required to attend "90% of regularly scheduled drills" without referring to the number of drills required or absences permitted.

(6) 3/21/79. Santos received another form notice of missed drills similar to the one he received in July 1976 referring only to the consequences of missing a "6th drill." [2]

On May 1, 1979 Santos signed a "Statement of Acknowledgement," [3] "to document my understanding of the explanation of the laws and regulations affecting my enlistment . . . ." The statement provided explicitly that pertinent statutes and regulations "may change without notice and that such changes may affect my status as a member of the Naval Reserve and obligations to serve as such." The statement further provided: "Satisfactory participation in the Ready Reserve requires my attendance annually at 40 drills of the unit to which assigned . . . ." The statement was given to Santos by the Career Counselor for his reserve unit with instructions to "read and sign it," which he did. Later and out of the presence of petitioner his signature was "witness[ed]" by the signature of LCDR J. A. Franco, the Commanding Officer of the Naval and Marine Corps Reserve Center at West Trenton, New Jersey.

On August 8, 1979 Santos missed two drills and was immediately nominated for active duty by his commanding officer. The nomination was mandatory, but the commanding officer recommended against recall. Santos's request for an excuse submitted August 11 was not granted and on September 19, 1979 recall orders were issued by the respondent Franklin, Commander of the Naval Reserve Readiness Command, Fourth Region. On October 10, 1979 Santos requested a hardship discharge from the Navy or, alternatively, from active duty. His commanding officer did not recommend approval and the discharge was denied two days later.

On October 23, 1979 Santos reported for active duty. On October 29 he consulted Navy legal assistance officer Lt. John J. Chernoski. Based on that interview, Lt. Chernoski wrote to the Commander of Naval Military Personnel Command recommending that Santos should be returned to reserve status because he had been misled

---

**2.** Sometime before or during 1977 Santos signed an undated statement certifying that he had "been briefed on the participation requirements and the revised procedures for involuntary activation." This is the only document which relates the 90% requirement to the limit of five unexcused drills, but it failed to say how many total drills were required.

**3.** The text is set out as an appendix to this opinion.

about the drill requirement by the May 1 "Statement of Acknowledgement." Chernoski also advised reconsideration of the request for discharge. The recommendation was repeated in two later messages, but was not accepted.

On November 8, 1979, *two weeks after* reporting to active duty, Santos signed an amended "Statement of Acknowledgement." This document was identical to the May 1 statement save for two changes. The November 8 statement stated correctly that as a reservist Santos was required to attend *forty-three* drills annually. This was the first occasion during petitioner's military service that he was correctly informed of the actual drill requirement and the only time he was given a figure stated in terms comparable to those in the May 1 statement. The November 8 statement also provided: "This entry supersedes your 1 May 79 Acknowledgement . . . ."

Santos commenced this action on January 16, 1980. The next day, Judge VanArtsdalen entered a preliminary injunction restraining naval authorities from transferring petitioner out of the Philadelphia area. Petitioner is presently on active duty.

## II.

■ The federal courts have habeas corpus jurisdiction under 28 U.S.C. § 2241(c)(1) to consider claims of unlawful detention by members of the armed forces. The activation of petitioner from the ready reserve to active military service satisfies the jurisdictional requirement of "custody." *Meck v. Commanding Officer, Valley Forge General Hosp.*, 452 F.2d 758, 760 (3d Cir. 1971).

■ Judicial authority in military affairs is circumscribed, however, both constitutionally by the doctrine of separation of powers and prudentially by deference to the special competence of the military and its need to maintain "good order." *See Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 609, 62 L.Ed.2d 540 (1980); *Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). Because prudential considerations do not apply equally in every case, the scope of judicial review of military decisions varies across a wide spectrum depending upon the character of the action challenged. *See Peavey v. Warner*, 493 F.2d 748 (5th Cir. 1974). Core military activity, such as the deployment of troops, is committed entirely to the judgment of military authorities and is reviewable, if at all, only for gross abuse of discretion. *See Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Byrne v. Resor*, 412 F.2d 774 (3d Cir. 1969). Similarly, the discretionary denial of an application for discharge as a conscientious objector is reviewed under the extremely lenient "basis in fact" standard. *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). But other sorts of questions, such as the interpretation of contracts, are more familiar to judges. Not only are such questions better suited to judicial review, but the degree of interference in military affairs is necessarily limited when the court can, at most, order the military respondent to do what it has already undertaken to do. *O'Mara v. Zebrowski*, 447 F.2d 1085, 1087 (3d Cir. 1971); *Smith v. Resor*, 406 F.2d 141, 146 (2d Cir. 1969). Thus, it has long been settled that on petition for habeas corpus the federal courts may consider service members' enlistment contract claims and decide them according to traditional principles of contract law. *See In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *Peavey*, 493 F.2d at 750; *Mellinger v. Laird*, 339 F.Supp. 434 (E.D.Pa.1972).[4]

---

4. *Grimley* also described the enlistment contract as one "which changes the status" to the consternation of later generations of judges and legal scholars. Whatever meaning this duality conveyed at the time, *see* Comment, *Armed Forces Enlistment: The Use and Abuse of Contract*, 39 U.Chi.L.Rev. 783, 785 n. 14 (1972), the modern trend clearly favors contract analysis. *See, e. g., Novak v. Rumsfeld*, 423 F.Supp. 971, 972 (N.D.Cal.1976); *Crane v. Coleman*, 389 F.Supp. 22, 23 n. 6 (E.D.Pa.1975) (Huyett, J.); *Bemis v. Whalen*, 341 F.Supp. 1289, 1291 (S.D.Cal.1972); *Matzelle v. Pratt*, 332 F.Supp. 1010, 1012 (E.D.Va.1971) ("Counsel agree that this case is governed by the law of contracts."); *see also, Neal v. Secretary of Navy*, 472 F.Supp. 763, 776 (E.D.Pa.1979) (Becker, J.)

■ To the extent petitioner argues that the May 1 statement constituted a binding contract, I must agree with the Navy that traditional contract principles cannot be stretched so far as to treat the May 1 statement as a contract in abrogation of Santos's original enlistment contract and Navy regulations. Similarly, petitioner's homogenized constitutional theory that the Navy denied him due process of law because it treated him unfairly is not impressive, particularly in a military setting. I need not reach the constitutional question, however, because I am persuaded that Santos is entitled to invoke the equitable remedy of estoppel against the Navy. Although it appears that no other court has had occasion to apply equitable estoppel against a branch of the armed services in this context,[5] careful examination of the emerging law of government estoppel in other fields leads me to conclude that estoppel is both permissible and equitable in this case.

### III.

The Third Circuit has observed that "[t]he doctrine of estoppel is not often permitted against a government. . . ." *Heirs of Denena v. Communication Splicing & Engineering Co.*, 474 F.2d 1249, 1250 (3d Cir. 1973), *citing In re Hooper's Estate*, 359 F.2d 569, 577–78 (3d Cir. 1966). This cautionary rule applies with particular force when a private litigant seeks by estoppel to have the courts supplant a sovereign function of the political branches of government, such as the legislative power. *See Tracy Leigh Development Corp. v. Gov't of the Virgin Islands*, 501 F.2d 439 (3d Cir. 1974). Nevertheless, the rule against estopping the government, like the doctrine of sovereign immunity from which it derives, has been weakened in recent years to the point where it is a pale shadow of its former self.

The chief cause of the demise of the absolute rule against government estoppel is its unfairness. "The claim of the government to an immunity from estoppel is in fact a claim to exemption from the requirements of morals and justice." Berger, *Estoppel Against the Government*, 21 U.Chi.L. Rev. 680, 707 (1954). This circuit has long recognized that "there are circumstances where the Government should be required by our law to stand behind the written agreements of a high public official. . . . in order to prevent manifest injustice." *Walsonavich v. United States*, 335 F.2d 96, 101 (3d Cir. 1964).[6] Courts have generally paired that manifest injustice "exception" with the balancing factor of the threat posed to the public interest by an estoppel. *See, e. g., United States v. Lazy F C Ranch*, 481 F.2d 985, 989 (9th Cir. 1973) (summarizing prior decisions). This inquiry goes to the heart of the rule against government estoppel which seeks primarily to prevent individual citizens from locking the government into a position contrary to the general welfare. The evil of "the tail wagging the dog" will not be present in every case, however, and when the public interest is

---

**5.** A similar claim was raised in *Dix v. Rollins*, 413 F.2d 711 (8th Cir. 1969), but was dismissed out of hand, on the ground, *inter alia*, that the facts showed neither reliance nor prejudice. The court explicitly distinguished the facts of this case, saying: "As we have heretofore pointed out, he was not called to active duty for failure to observe drill requirements or reserve duties but was only called after a [presidential] determination was made that a substantial need existed for calling reservists to active duty." *Id.* at 716.

A line of decisions by the United States Court of Military Appeals estops the government from asserting a "constructive enlistment" when an underage recruit reaches majority while in military service. *See, e. g., United States v. Brown*, 23 C.M.A. 162 (1974). In

*Brown*, the estoppel was based upon the conduct of the recruit's commanding officer who, upon learning of the fraudulent enlistment, failed to act to discharge the recruit. *See also United States v. Russo*, 23 C.M.A. 511 (1975); *United States v. Catlow*, 23 C.M.A. 142 (1974). Counsel for the Navy, while reaching a different conclusion, agrees that Santos's claim is best analyzed in terms of estoppel.

**6.** *Walsonavich* quoted the following passage from *Ritter v. United States*, 28 F.2d 265, 267 (3d Cir. 1928): "The acts or omissions of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government, if the officers have acted within the scope of their authority."

not at stake the reasons for holding the government to its word are more compelling. *See In re LaVoie,* 349 F.Supp. 68, 74 (D.V.I.1972). Finally, the court is constrained in its balancing of considerations of policy and equity by the requirement that the act by which the government is estopped be "affirmative misconduct"—in this case, affirmative misrepresentation rather than mere failure to inform. *United States Immigration & Naturalization Service v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (per curiam) (by implication); *United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir. 1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *Yang v. I.N.S.,* 574 F.2d 171, 175 (3d Cir. 1978) (dictum).

■ Putting aside for the moment the question whether estoppel should apply against the Navy here, it is clear that the general criteria governing estoppel are applicable to these facts. Both parties rely upon the leading Ninth Circuit case, *United States v. Georgia Pacific Co.,* 421 F.2d 92 (9th Cir. 1970) for a statement of the necessary elements of estoppel. The elements are:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it so intended;

(3) The latter must be ignorant of the true facts; and

(4) He must rely on the former's conduct to his injury. *United States v. Ruby Co.,* 588 F.2d at 703, *quoting Georgia-Pacific,* 421 F.2d at 96.[7]

Counsel for the Navy quite properly concedes the first and second elements. The first paragraph of the "Statement of Acknowledgement" put Santos on notice that the purpose of the document was to verify his understanding of his obligations as a reservist. The Navy could not seriously contend that the statement was not intended to be relied upon or that Santos was not justified in believing that it was so intended.

■ I find that the third element, ignorance of the true facts, is also in Santos's favor. As already recounted, during his prior five years in the Navy, incredible as it may seem, Santos was *never* directly told that he was required to attend forty-three drills. Instead, he was told that his drill requirement was ninety percent of an unnamed figure. On the few occasions he was given actual numbers, they were sometimes incorrect and never set forth in a consistent manner. Only after his activation was Santos ever informed of the number of drills actually required as provided in the May 1 statement.

Even if Santos had better information, he would still have been instructed to ignore it by the very statement he signed which warned that "statutes and pertinent regulations . . . may change without notice and . . . such changes may affect [your] status as a member of the Naval Reserve and obligations to serve as such." Indeed, it would seem to be the principal purpose of the May 1 document to inform Santos that his obligation was changeable and to apprise him of his current status. In the face of this adjuration and given the myriad variations of the notice afforded Santos, I have no difficulty concluding that he did not and reasonably should not have known that forty drills was an incorrect figure.

■ For the fourth element, detrimental reliance, the important question is timing. The Navy admits that the misrepresentation occurred while Santos was still in compliance, but argues that his behavior *after* activation belies reliance. The Navy points to petitioner's initial resort to requesting a hardship discharge as a particularly suspicious circumstance. I am not persuaded that the necessary or even probable infer-

---

7. This test was applied by the Third Circuit in *Walsonavich,* 335 F.2d at 101 and more recently in *Consol. Express Inc. v. New York Shipping Ass'n,* 602 F.2d 494, 510–11 (3rd Cir. 1979) (petitions for *cert.* pending).

ence from petitioner's pursuit of a hardship discharge is ignorance of his additional claim of reliance on the misrepresentation. Santos may well have wanted to make a direct appeal to sympathy rather than an argument of right, not an unreasonable strategy in a military setting. In any case, his claim of reliance surfaced soon enough—within a week after he reported for active duty.

The affirmative evidence of reliance is strong. Santos in fact met the forty drill requirement, and the timing of events coincides with his claim of reliance. The representation of the May 1 statement that it set forth the current legal requirements for reservists invited Santos to depend on that information.  .

During cross-examination of the petitioner counsel for the respondents elicited that Santos kept track of his compliance with the drill requirement by counting drills missed instead of drills attended, implying that he did not rely on the May 1 statement which spoke only of an attendance requirement. Counsel's point is well taken but not dispositive. It is a simple matter to subtract forty from the well-established figure of forty-eight drills scheduled and petitioner testified that he believed he was entitled to eight absences. Petitioner's credibility is bolstered by the fact that his drill assignments isolated him from other drilling reservists with whom he might have compared notes.

The evidence that Santos's reliance was reasonable is stronger still. The statement Santos signed was an official document, purporting to describe his legal obligations. The number of drills described there did not differ markedly from what he had been told before, so as to put him on inquiry notice. Moreover, he was informed by the document itself that the requirements were subject to change. After considering all of the evidence, I find that petitioner has established by a preponderance of the evidence that he relied upon the May 1 statement in accounting for only forty-two drills, that it

was reasonable for him to do so, and that he did so to his detriment.

█ I now turn to the question of whether estoppel is available against the Navy in this case. It would be grossly unjust to deprive Santos of the equitable protection of estoppel on these facts. He has suffered a significant loss of personal liberty as well as disruption of his family life, not through any fault of his own but because of the affirmative misrepresentation of another. See Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7.

After careful consideration, I also conclude that estoppel against the government in this case would not significantly impair an important public policy. First, many courts have said, see, e. g., O'Mara, 447 F.2d 1085, that the purpose of involuntary activation is not to punish the reservist for his dereliction but "to maintain the military proficiency that is otherwise maintained by attendance at unit training assemblies." Id. at 1089. The seven months Santos has now served on active duty should assure his military preparedness. Second, the relief requested here is limited to one individual and for one year. The Navy may continue to require forty-three drills of reservists including Santos, as it did before. Third, the application of estoppel will do no serious harm to command discipline. Santos was ordered to active duty over the opposition of his commanding officer and despite the strenuous protest of a Navy legal officer. The process involved here was more akin to hierarchical bureaucratic decisionmaking than to battlefield orders. Finally, it should be obvious that in this day of the volunteer army and "guaranteed" enlistment options, the Navy has an affirmative interest in promoting fair dealing with its recruits. Novak v. Rumsfeld, 423 F.Supp. 971, 972 (N.D.Cal.1976).

## IV.

Some of the older modern government estoppel cases, e. g., Georgia-Pacific, 421 F.2d 92, held that the government may only be estopped to perform proprietary as op-

posed to sovereign acts.[8] I decline to give that dichotomy dispositive weight, but, considering it as another factor in the balance, I conclude that the conduct involved here was proprietary. This is plainly the teaching of the progeny of *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636, which hold that enlistment contracts are governed by ordinary principles of contract law. Counsel for the Navy likens the acts in question here to "running a Navy" and argues that nothing could be more sovereign. This argument overlooks the particular function involved. With equal generality it can be said that the power to tax and to regulate immigration are quintessentially sovereign, but, under appropriate facts, estoppel is available against the agencies responsible for taxation and immigration. *See, e. g., Walsonavich*, 335 F.2d 96 (IRS); *Santiago v. I. N. S.*, 526 F.2d 488 (9th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). The "sovereign function" argument merely reiterates the Navy's position on the scope of review. I cannot agree that the Navy's determination that petitioner did not attend the required *number* of drills, as opposed to a determination that his participation in a given drill was unsatisfactory, requires the exercise of peculiarly military discretion.

The only remaining barrier to the application of estoppel is the hoary doctrine that the government cannot be bound or estopped by the *unauthorized* act of an agent. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). The Navy argues that since the Career Counselor who prepared the May 1 statement lacked the power to modify the drill requirement, his act cannot give rise to an estoppel.

On the facts before me, it would be unconscionable to permit the Navy to disavow the act of its agent on the ground that the agent erred. Chief Judge Chambers captured nicely the sense of outrage that the "actual authority" doctrine provokes:

> To say to these appellants, "the joke is on you. You shouldn't have trusted us," is hardly worthy of our great government.
>
> We would have a much different case if the boobytrap unwittingly set for [appellants] had somehow hurt the government. Bad advice cannot ordinarily justify giving away to individuals valuable government assets. This is no such case.

*Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970). Here, as in *Brandt*, the petitioner does not seek a windfall but merely to regain an option foregone in reliance on official misstatement.

I am also not convinced that the law requires such a draconian application of the actual authority rule. In later decisions the Supreme Court has retreated from its early absolutist position. *Compare Utah Power & Light Co.* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791, with *Moser v. United States*, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 658 (1951). Moreover, if the actual authority requirement is taken literally, then the restriction implied by the Supreme Court in *Hibi* that estoppel requires "affirmative misconduct" by a government agent is nonsense, or close to it: unconstitutional conduct aside, an act authorized by law can seldom if ever be termed affirmative misconduct. In recent years the federal courts have increasingly resisted harsh application of the actual authority rule, tempering it with a practical evaluation of all the surrounding circumstances, including the scope of the agent's authority—actual and apparent, the nature of the misrepresentation and the extent of the relief requested against the government.[9]

---

**8.** The distinction observed in *Georgia-Pacific*, never especially helpful, has been abandoned in later Ninth Circuit cases. *See Morris v. Andrus*, 593 F.2d 851, 854 (9th Cir. 1979); *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir. 1978). In *Lazy F C,* the Ninth Circuit noted that the proprietary-sovereign distinction is subsumed within the consideration of the public interest—sovereign acts are more likely to implicate the general welfare. 481 F.2d at 989 n.5.

**9.** *See, e. g., Brandt*, 427 F.2d 53; *Oil Shale Corp. v. Morton*, 370 F.Supp. 108, 126 (D.Colo. 1973); *In re LaVoie*, 349 F.Supp. 68 (D.V.I. 1972); *Gestuvo v. District Director, I. N. S.*, 337 F.Supp. 1093 (C.D.Cal.1971); *United States v. Lazy F C Ranch*, 324 F.Supp. 698 (D.Idaho 1971), *aff'd*, 481 F.2d 985 (9th Cir. 1973). *But see Jackson v. United States*, 573 F.2d 1189 (Ct.Cl.1978).

Under these circumstances, I conclude that the counselor had sufficient authority to estop the Navy. I agree with Judge Wisdom that in the inherently coercive setting of the military, the important and realistic question is the *apparent* authority of the officer. *Shelton v. Brunson,* 454 F.2d 737, 737–38 (5th Cir. 1972) (dissenting from denial of interlocutory injunction). A sailor simply does not have the freedom of the typical government contractor to determine for himself the authority of the officer with whom he deals. I find that the counselor had apparent authority, and moreover, as the Navy concedes, that it was within the scope of his *actual* authority to counsel petitioner about the drill requirement, although his specific advice was contrary to regulations.[10] Given finally that the commanding officer of the unit, LCDR Franco, approved the erroneous statement without objection I conclude that petitioner may assert an estoppel for the limited relief sought here against the Navy.

A final note on fairness is in order. In *O'Mara v. Zebrowski,* 447 F.2d at 1089–90, the court relied upon a "Statement of Acknowledgement" such as that signed by petitioner here to show that the reservist there understood his obligation to attend training drills and the consequences of failing to do so.[11] The court concluded that O'Mara's involuntary activation did not offend due process, in part because of the understanding of his rights and duties attested to in the "Statement of Acknowledgement." It may be that the involuntary activation procedure is constitutionally adequate without "Statements of Acknowledgement," although Judge Van Dusen implied that even with such statements *O'Mara* was a close case. But if the armed forces are to hold reservists to know the content of these statements and to be bound by them, then they must be prepared to accept a measure of mutuality of obligation.

## V.

Since Santos will now be returned to reserve status, his request for a hardship release from active duty is moot. To the extent he seeks in addition a discharge from the Reserve, his claim lacks merit.

■ Petitioner argues that sub-section 3 of Article 3850240 of the Manual of the Bureau of Naval Personnel requires that he be informed of the "criteria" used to evaluate requests for hardship discharges and that the Navy's failure to do so voids its denial of his request. Sub-section 3 does not mandate notice of "criteria," however, but of "the proper *procedure* to follow" in requesting a discharge.[12] The only reference to substantive standards in sub-section 3 runs counter to petitioner's reading of the regulation: "It should be clearly explained to each applicant . . . that the decision is within the sole discretion of the Chief of Naval Personnel . . . ." The provision of which Santos claims prejudicial ignorance, sub-section 2.d(2), states even more forcefully, "whether the mental illness of the member's spouse is severe enough to warrant a Hardship Discharge is a determination wholly and solely within the discretion of the Chief of Naval Personnel or his designee." To the same effect is

---

10. This fact alone may bring this case within the Third Circuit's definition of actual authority in *Walsonavich* as "[authority] to bind the United States in a particular transaction, . . . if the officers had acted within the scope of their authority." *See* n.6, *supra.*

11. *See also Chalfant v. Laird,* 420 F.2d 945 (9th Cir. 1969) ("Statement of Understanding" binding on enlistee); *Pfile v. Corcoran,* 287 F.Supp. 554 (D.Colo.1968) ("Statement of Acknowledgement" binding on enlistee).

12. Sub-section 3 provides in pertinent part:
    Enlisted personnel who desire to request discharge or release to inactive duty, as appropriate, for dependency or hardship reasons shall be informed of the proper procedure to follow. It should be clearly explained to each applicant that a request shall be submitted via official channels, that submission of a request is no assurance that discharge or release to inactive duty will be authorized, and that the decision is within the sole discretion of the Chief of Naval Personnel or his designee, regardless of the recommendations of any other military authority. Each such request received will be carefully and sympathetically considered and a final decision will be based upon its individual merits. . . .
    Petitioner's affidavit establishes that he was adequately informed of the procedure for submitting a request for discharge.

sub-section 1 of Article 3850240: "The decision of whether a hardship discharge should be granted is purely a military discretionary decision and no service member has a right to discharge from the Navy." In the face of these declarations, the requirement petitioner reads into sub-section 3 would be all but meaningless. Petitioner received the notice to which he was entitled under the regulations.

## VI.

Petitioner seeks damages against two naval officers, CDR James Franklin, Commander, Naval Reserve Readiness Command, Region Four and Rear Admiral C. J. Seiberlich, Chief of Naval Personnel of the United States Navy. The asserted claim arises directly out of the Fifth Amendment. *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

A careful examination of the complaint and the evidence fails to reveal what unlawful actions are attributed to Rear Admiral Seiberlich. The only possible mention of Seiberlich in the complaint, other than to identify him, is a reference to the title "Commander, Navy Military Personnel Command" in paragraph 25. This unnamed person is alleged to have received Lt. Chernoski's recommendation that Santos be released from active duty. The title in paragraph 25 bears only á passing resemblance to that in the caption. Assuming the two titles do indeed refer to the same person, then Seiberlich is still only charged with receiving a letter. Nothing approaching a constitutional violation has been alleged or proven with respect to Seiberlich, and accordingly he is entitled to judgment on the damage claim.

CDR Franklin's connection with Santos is more readily apparent. He is alleged to have issued the orders recalling petitioner to active duty (paragraph 17) and to have recommended against approval of petitioner's hardship discharge (paragraph 21). I have already rejected petitioner's notice challenge to the denial of his request for discharge, and I further find that there is no evidence that the Naval authorities abused their broad discretion to deny petitioner's request on the merits.[13]

■ What remains is Franklin's allegedly unlawful act of ordering Santos to active duty. A panel of the Third Circuit held that the doctrine of intra-military immunity established in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) does not extend to "intentional tort[s] conducted without authority or military justification, in willful violation of fundamental constitutional rights. . . ." *Jaffee v. United States*, No. 79–1543, slip op. at 6 (3rd Cir. Feb. 20, 1980), *vacated and set for rehearing en banc* (April 11, 1980). Even under the relatively narrow view of intra-military immunity taken by the panel in *Jaffee*, Franklin has established his immunity from suit for ordering Santos to active duty.

In his answer, Franklin asserts by way of defense that he complied with all applicable regulations and acted within the scope of his official function and discretion. This defense is fully supported by the entries in petitioner's service record and undisputed factually by Santos.[14] Instead, petitioner raises the legal argument that his activa-

---

**13.** To the contrary, it appears that Santos's request received judicious consideration. The recommendation of Santos's commanding officer, adopted by CDR Franklin, reads in part:

After a brief interview with H.A. SANTOS, there appears [*sic*] to be two factors that support his reluctance to perform extended active duty. The first concern is financial, and the second is generally centered around his family. Although these two concerns are universal throughout the military forces, they are a little stronger in H.A. SANTOS. Still, these concerns are not impressive enough for me to give this request a favorable recommendation. I feel he will survive this period of extended active duty, but he and the Navy will not benefit from it.

**14.** Even if the estoppel worked against the Navy in this case could be said to rise to the level of a constitutional proscription, petitioner admits that the drill requirement was in fact 43, that he attended only 42, and that Franklin had authority to order him to active duty for doing so.

tion was unconstitutional because Franklin failed to investigate his family situation. He contends that such an investigation was required by 10 U.S.C. § 673a(c).

I disagree with petitioner's reading of the statute. Section 673a(c) provides that: "To achieve fair treatment among members of the Ready Reserve who are being considered for active duty under this section, appropriate consideration shall be given to —(1) family responsibilities. . . ." The statute speaks of "appropriate consideration," not investigation, and *McSweeney v. United States*, 338 F.Supp. 350 (N.D.Ohio 1971) cited by petitioner is not to the contrary. Moreover, petitioner offers no reason to place the duty imposed by § 673a(c) on Franklin's shoulders. The record is clear that Santos's superior officers had knowledge of his family responsibilities and considered them before he was ordered to active duty. That petitioner was in some part responsible for that knowledge is of no consequence.

I find that respondent Franklin is immune from suit for the actions complained of and he is, accordingly, entitled to judgment as a matter of law.

## APPENDIX

### ADMINISTRATIVE REMARKS   SEE BUPERSMAN 5030420

SHIP OR STATION

#### NAVAL AND MARINE CORPS RESERVE CENTER, WEST TRENTON, NEW JERSEY 08628

1 MAY 79   : This Statement of Acknowledgement is executed to document my understanding of the explanation of the laws and regulations affecting my enlistment in the Naval Reserve Special Enlistment Program. I understand that Federal statutes and pertinent regulations applicable to members in the United States Naval Reserve may change without notice and that such changes may affect my status as a member of the Naval Reserve and obligations to serve as such.

By signing the enlistment contract, I obligate myself to serve a period of six years in the Naval Reserve and upon completion of this obligation, I will be eligible for discharge or consideration for reenlistment.

I will be required, within 180 days after enlistment, to perform a period of active duty for training for a minimum of four months and a maximum of sufficient length to complete Class A School training and such additional training as considered necessary to qualify for the military specialty or rating for which I enlisted.

I will be a member of the Ready Reserve for the six year period of my enlistment unless eligible for transfer to the Standby Reserve as provided in 10 U.S.C. 269. As a member of the Ready Reserve, I am liable for active duty in time of war, in time of national emergency declared by the Congress or proclaimed by the President, or when otherwise authorized by law, I understand that it is my responsibility to keep the custodian of my service record advised of a mailing address at which I amy be reached and that I must reply promptly to all official correspondence.

Satisfactory participation in the Ready Reserve requires my attendance annually at 40 drills of the unit to which assigned and to perform not less than 14 days of active duty for training, exclusive of travel time, each fiscal year, unless excused by competent authority. Failure to meet prescribed standards for attendance at drills and active duty for training, advancement in qualifications and/or performance of duty may subject me to the following action:

a. Involuntary call to active duty for a period not to exceed 24 months when combined with previous active duty and active duty for training.

b. If I have insufficient obligated service remaining to warrant a period of active duty, my enlistment may be involuntarily extended in order to complete the

prescribed period of active duty or my draft deferment may be cancelled and I may become eligible for a general administrative discharge.

/s/ Richard J. Santos
(Signature of Enlistee)

/s/ J. A. FRANCO, LCDR
(Signature of witness)

| NAME (Last, First, Middle) | SSN | BRANCH AND CLASS |
|---|---|---|
| SANTOS, RICHARD JOSEPH | 143–48–5464 | USNR–R |