**Robert W. NIXON, Plaintiff-Appellant,**

v.

**SECRETARY OF the NAVY, Defendant-Respondent.**

**No. 412, Docket 34128.**

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1969.

Decided Feb. 3, 1970.

George J. Robertazzi, Brooklyn, N. Y., for appellant.

Morton Hollander, Department of Justice, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Edward R. Neaher, U. S. Atty., Eastern District of New York, and J. F. Bishop, Department of Justice, Washington, D. C., on the brief), for appellee.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is an appeal from a judgment and order of the District Court for the Eastern District of New York, denying in an unreported opinion the application of the petitioner Nixon for a declaratory judgment and writ of mandamus requiring the Secretary of the Navy to cancel a two-year enlistment extension agreement and discharge appellant from the Navy.

On February 5, 1965, the appellant enlisted in the United States Navy for a period of four years under the "High School-Junior College Graduate Training Program" for participation in the nuclear field program.[1] Nixon completed his basic training with satisfactory results, and was transferred to a Class "A" School at Great Lakes Naval Training Center for technical training. Because participation in the nuclear program requires a six-year service commitment while at Class "A" School, Nixon executed an agreement for a two-year extension for the term of his enlistment,[2] which contained the following statement:

"Training (Nuclear Field Program— BPI 1306.64 series). I understand that upon successful completion of Class 'A' School this agreement becomes binding and thereafter may not be cancelled except as set forth in BUPERSMAN Art. C-1407."[3]

The agreement was signed on October 25, 1965. Nixon graduated from Class "A" School on February 6, 1966, received a pay advance to Grade E-4, and was transferred to the Naval Nuclear Power School at Bainbridge, Maryland.[4] Following graduation from Power School on September 16, 1966, he received Nuclear Plant Operator instruction at Windsor, Connecticut, and attended the basic submarine course at New London, Connecticut. After completing these courses, he was assigned to the nuclear submarine USS Theodore Roosevelt for sea duty, commencing on September 6, 1967, and scheduled to continue for 14 months.

Nixon completed only one Polaris Deterrent Patrol (consisting of two months submerged operation at alert status), however, before requesting relief from submarine duty. On January 28, 1968, he submitted a request for disqualification for duty in submarines on the ground that he was no longer a volunteer for submarine duty and that he could not master the living and working conditions required for the Polaris program.[5] Citing Nixon's "inability to

---

1. The appropriate enlistment regulations can be found in the Navy Recruiting Manual §§ C–2201 to 2204. The rate assigned Nixon on enlistment, SN(JC–NF), indicates that he had volunteered for the nuclear field.

2. The six-year requirement is set out in the Navy Recruiting Manual § C–2202(1) (d), which provides as follows:
   "(d) Applicants who enlist in the Nuclear Field or the Polaris Field for a term of less than 6 years will be required to extend their enlistment so as to have a total of 6 years of active obligated service computed from time of original entry into the Regular Navy. Such extension must be effected prior to graduation from Class "A" School except that applicants attending Class "A" School who enlisted for minority and who will become 18 years of age subsequent to graduation will be extended on their 18th birthday."

3. BPI or BUPERINST both mean Bureau of Naval Personnel Instructions; BUPERSMAN means Bureau of Naval Personnel Manual. As BUPERINST and BUPERSMAN are the abbreviations commonly employed by the Navy, they will be used throughout this opinion.

4. On February 5, 1966, Nixon signed a second two-year extension agreement, in order "to have sufficient obligated service to be eligible for automatic advancement to pay grade E–4 (ETN 3) under the provisions of BUPERINST 1430.14 Series." This agreement was to replace the original October 25, 1965, extension, which had been cancelled on February 4, 1966. On November 22, 1968, the Chief of Naval Personnel re-instated the original extension agreement, stating that it had been cancelled in error, and cancelled the February 5, 1966, agreement as being unnecessary. Nixon does not challenge these actions, and apparently concedes that the October 25, 1965, agreement should be viewed as never having been cancelled and the February 5, 1966, agreement as if it had never been executed. Accordingly, we will throughout treat the case as if the October 25, 1965, agreement were the only one executed, viewing the February 5, 1966, agreement as null and void. See note 6 infra.

5. The full text of Nixon's request of Jan. 28, 1968 to his flotilla commander for relief from submarine duty was as follows:
   "1. In accordance with reference (a) I am submitting my statement of non-

progress at a reasonable rate of qualification," the commanding officer of the USS Theodore Roosevelt recommended that Nixon's request for removal from submarine duty be approved and that he be transferred to "submarine support activity." The Chief of Naval Personnel approved the request and on February 20, 1968, Nixon was declared no longer eligible for nuclear power plant operation and was transferred to the USS Compass Island effective March 20, 1968.

On October 8, 1968, Nixon, through his attorney, requested cancellation of the two-year extension agreement because "the reason for said extension has ceased to exist and the condition under which it was to become operative has failed to materialize." On November 22, 1968, the Chief of Naval Personnel rejected the request for cancellation and ruled that Nixon was obligated to serve the additional two years active duty.[6]

On January 28, 1969, Nixon filed a petition in the district court in which he requested that a declaratory judgment be entered, pronouncing all extensions of his enlistment contract null and void and that the Secretary of the Navy be ordered to take the appropriate steps to cancel the extensions and discharge Nixon from further service in the Navy.[7] On August 13, 1969, the district court denied all relief requested by Nixon, granted the Secretary's motion for summary judgment, and dismissed the complaint.

Nixon's first claim is that under the appropriate regulations it was mandatory that his October 25, 1965 extension agreement be cancelled, and that it was error for the district court not to so find. Before examining the merits of this claim, it should first be noted that if the Navy did fail to follow its own directives it is clear that the district court would have had the power to issue the requested writ. While the courts are reluctant to interfere in military affairs, the Navy is bound by its own validly promulgated regulations, and the district courts are free to entertain suits by servicemen requesting compliance with such rules. Smith v. Resor, 406 F. 2d 141 (2 Cir. 1969); Hammond v. Lenfest, 398 F.2d 705 (2 Cir. 1968). Upon examination of the merits, however, we cannot agree with appellant's claim that he was entitled to mandatory cancellation of the October 25, 1965 extension agreement.

Under the terms of the agreement itself Nixon was bound to the two-year extension from the moment he graduated from Class "A" School on February 6, 1966, and he could only be released in accordance with BUPERSMAN Art. C–1407.[8] Of course, his application for cancellation must have been filed in time.

volunteer status and requesting disqualification from duty in submarines.

2. I am no longer a volunteer for duty in submarines. I have found the submarine service in conjunction with the spector of the Nuclear Power Program to be conflicting with my personality and nature. The required qualification programs are exceedingly rigorous and difficult to master. My ability to cope with the ordinary day to day living situation has lessened markedly. Further service in the submarine force or the Naval Nuclear Propulsion Program will be of no benefit to myself or the Navy."

6. Although Nixon's request for cancellation was primarily directed at the February 5, 1966, extension agreement, it also attacked the validity of the October 25,

1965, agreement. The Chief of Naval Personnel treated the request as one for cancellation of the October 25, 1965, agreement, and denied cancellation on the grounds that Nixon did not have a meritorious claim. See note 4, supra.

7. Jurisdiction to issue a declaratory judgment is based on 28 U.S.C. § 2201. Jurisdiction for the issuance of a writ of mandamus is based on 28 U.S.C. § 1361.

8. The date upon which the agreement became binding and the reference to BUPERSMAN Art. C–1407 for regulations concerning cancellation are both contained in BUPERINST 1306.64(9) as well as in the extension agreement itself.

■ BUPERSMAN C–1407(3) (a) says, "* * * a valid extension of enlistment that has become operative cannot be cancelled," and BUPERSMAN C–1407(1) (c) provides that an extension "becomes operative" on "the date on which the Extension of Enlistment goes into effect and service thereunder commences." In Nixon's case that date was February, 6, 1969, and his *October 8, 1968* request was therefore timely.

■ The regulation governing Nixon's right to mandatory cancellation is BUPERSMAN C–1407(3) (b), the pertinent portion of which reads as follows:

"(b) Commanding officers *shall* cancel agreements to extend enlistment, prior to operative date, in the following cases:

* * * * * *

4. * * * when an individual, through no fault of his own, has not received any of the benefits for which the extension was executed by the day next preceding the operative date of the extension."

The district court found that Class "A" School training was a benefit contemplated under the agreement, and that Nixon was therefore not entitled to mandatory cancellation. Nixon argues, however, that as the signing of an extension agreement was not a prerequisite for Class "A" School training, graduation from that school was not a benefit contemplated by the extension agreement. Assuming, without deciding, that Nixon is correct and that graduation from Class "A" School does not preclude mandatory cancellation under BUPERSMAN Art. C–1407(3) (b) (4), it is still clear that Nixon was the recipient of sufficient benefits contemplated by the extension agreement to bar mandatory cancellation. These include his attendance at and graduation from Nuclear Power School, instruction as Nuclear Plant Operator, and the basic submarine course, as well as his advancement to a higher pay grade. All of these were benefits which came to Nixon from his entering into the extension agreement, and thus preclude cancellation of that agreement under BUPERSMAN Art. C–1407(3) (b) (4).

■ Finally, Nixon urges that he is entitled to mandatory cancellation because the "purpose of the extension," namely, qualification as a nuclear power plant operator, has not been realized. But BUPERSMAN Art. C–1407(3) (b) (4) does not speak in terms of the "purpose of the extension," but rather limits mandatory cancellation only to those situations where the enlistee has not received "any of the benefits" contemplated by the extension agreement. In the light of the benefits which Nixon received, the district court's determination that he was not entitled to mandatory cancellation of his extension agreement under BUPERSMAN Art. C–1407(3) (b) is correct.

Nixon's second claim is that even if he is not entitled to mandatory cancellation of the extension agreement, it was improper for the Chief of Naval Personnel not to grant a discretionary cancellation and the error was compounded when the district court refused to order him to do so. The portion of the regulation, BUPERSMAN Art. C–1407(3) (a), which Nixon seeks to invoke reads as follows:

"* * * Requests or recommendations for cancellation of agreements to extend enlistments which have not become operative and for which authorization is not provided below and which appear meritorious, shall be forwarded to the Chief of Naval Personnel for determination."

To implement the exercise of this discretionary authority, the Chief of Naval Personnel issued certain instructions which preliminarily described the categories of enlistees whose individual cases would be considered for discretionary cancellation. The instructions in effect in 1965, when Nixon enlisted, were set out in BUPERINST 1306.64D(9) (d) and provided as follows:

"Once Nuclear Field Personnel have executed agreements to extend their enlistments as outlined above, requests

for cancellation of their extensions will be considered only in the following cases:

(1) When an individual enrolled in the program is dropped from Basic Submarine School for purely academic reasons, after having satisfied Basic Submarine School Instructors that he has tried to the very best of his ability to make passing grades during the course of instruction.

(2) When an individual enrolled in the program is on board a submarine or nuclear surface ship for approximately six months evaluation period prior to being ordered to Nuclear Power School, and is recommended by his commanding officer to be dropped from the Nuclear Field Program, through no fault of his own.

(3) When an individual enrolled in the program is not ordered to nuclear power training for any other reason through no fault of his own. In each case the final decision will rest with the Chief of Naval Personnel."

These instructions were amended on April 13, 1966, prior to Nixon's request for cancellation, and new provisions were sent out in BUPERINST 1306.-64E(9) (c) as follows:

"Requests for cancellation of extensions will be considered only in the following cases:

(1) When an individual enrolled in the program is on board a submarine or surface ship for approximately six months evaluation period prior to being ordered to Nuclear Power School, and is recommended by his commanding officer to be dropped from the Nuclear Field Program, through no fault of his own.

(2) When an individual enrolled in the program is not ordered to nuclear power training for any other reason through no fault of his own."

When Nixon presented his request, the Chief of Naval Personnel declined to grant a discretionary cancellation on the ground that he had received Nuclear Power School training. The district court decided that in the light of BUPERINST 1306.64D and E, the Chief of Naval Personnel had acted properly within the scope of his discretionary authority. On appeal Nixon argues that the issuance of the instructions was not a valid exercise of the discretionary power granted by BUPERSMAN Art. C–1407(3) (a), and that even if it were, it is arbitrary as applied to him.

■■ Before considering the merits of Nixon's second claim, it is necessary briefly to examine the district court's power in the area of discretionary military decisions. As the Supreme Court stated in Orloff v. Willoughby, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), the day-to-day operations of the armed forces are best left to the military, and the courts should not play a role in reviewing the exercise of discretionary military decisions. But as we noted in United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371, 374 (2 Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969), there are certain limitations to this "hands-off" policy, and official military conduct may go so far beyond the limits of what may be considered a rational exercise of discretion as to call for mandamus. Appellant claims that this is true where the power to make a discretionary decision exists, and yet the appropriate official declines or neglects to exercise his discretionary power. See United States v. Nebbia, 357 F.2d 303 (2 Cir. 1966); Udall v. Taunah, 398 F. 2d 795 (10 Cir. 1968); Connett v. City of Jerseyville, 125 F.2d 121 (7 Cir. 1942).

■ In the present case appellant urges that the Chief of Naval Personnel never exercised his discretionary power to pass on a request for cancellation of an extension agreement, but rather simply applied the strict rules set out in BUPERINST 1306.64(9) without further consideration. Nixon argues that his case was thus denied the personal consideration envisioned by the grant of discretionary power contained in BUPERSMAN Art. C–1407(3) (a). The es-

**940**

sence of this argument is that the promulgation of BUPERINST 1306.64 by the Chief of Naval Personnel cannot satisfy the requirement that discretionary judgment be exercised in the case of a request for cancellation. With this we disagree.

The regulations set out in BUPERINST 1306.64(9) simply put forward certain guidelines which will be followed in all cases involving a request for the discretionary cancellation of an enlistment extension agreement. As noted in those instructions, the Chief of Naval Personnel had reached the conclusion that a request for cancellation will not be considered meritorious once an enlistee in the nuclear power field has completed Nuclear Power School. Instead of this being a refusal to exercise discretion, however, it is, in itself, an act of discretion which establishes categories of eligibility and non-eligibility. It affords a disclosure in advance of certain factors which will apply in the Chief of Naval Personnel's discharge of his discretionary function. This is an administrative practice which is to be commended rather than condemned, so long as the classification of those ineligible for cancellation has a reasonable and logical basis, such as getting a fair return in longer service from those who have sought and received costly specialized training, and is not simply arbitrary. See K. Davis, Discretionary Justice 97–114 (1969).

 Nixon does claim that the determination that no enlistee who has completed Nuclear Power School will be granted a discretionary cancellation of his enlistment extension is so arbitrary as to require judicial interference. This school provides five months of intensive training in nuclear physics and related subjects. It is clear that by sending a man to the school the Navy has lost his services for an extended period of time, and has made a considerable financial investment in the expectation of his future Navy service. Even though Nixon was unable to use his training in the Polaris submarine service, he was apparently able to serve on a submarine tender or other submarine support assignments. We are of the opinion that the ruling of the Chief of Naval Personnel was not so arbitrary as to justify judicial intervention.[9]

The judgment of the district court denying mandamus and dismissing the complaint is affirmed.

---

9. Even had the Chief of Naval Personnel not exercised his discretion, we would not issue an order requiring Nixon's discharge from the Navy. In such a case we would be limited to remanding the case to the district court with instructions to direct the Chief of Naval Personnel to

give the request further consideration. Any other action would be an impermissible infringement on the power of the Navy first to exercise its discretionary powers. See Guffanti v. Hershey, 296 F. Supp. 553, 555 (S.D.N.Y.1969).