Gary L. McCRACKEN

v.

UNITED STATES of America; Harold Brown, Secretary of Defense; Eduardo Hidalgo, Secretary of the Navy; P. C. Conard, Commander, Naval Military Personnel Command; and W. S. Rich, Commanding Officer, USS Fulton (AS–11).

Civ. A. No. H–80–239.

United States District Court,
D. Connecticut.

Dec. 5, 1980.

Robert I. Reardon, Jr., Shapiro & Reardon, P.C., New London, Conn., for petitioner.

George J. Kelly, Jr., Asst. U. S. Atty., Richard Blumenthal, U. S. Atty., for the District of Connecticut, Hartford, Conn., for respondents.

## MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

CABRANES, District Judge:

■ In this action, Petty Officer Gary L. McCracken of the United States Navy seeks a writ of habeas corpus, ordering his release from the Navy.[1] McCracken argues that he signed the agreement extending his term of enlistment in reliance upon oral representations of a recruiter concerning the training he would receive in the service. He further alleges that the Navy failed to give him the two years of training which he was promised in return for the two–year extension of his term of enlistment. As a remedy for what he contends is the Navy's breach of a contractual obligation to him, McCracken claims that he is entitled to recission of that contract and his freedom from the military service with an honorable discharge.

---

1. A petition to a district court for habeas corpus under 28 U.S.C. § 2241 is unquestionably a proper remedy for a person who claims that he is unlawfully being held in the custody of the military. *See, e. g., Parisi v. Davidson*, 405 U.S. 34, 39, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972); *Schlanger v. Seamans*, 401 U.S. 487, 489, 91 S.Ct. 995, 997, 28 L.Ed.2d 251 (1971); *Jones v. Cunningham*, 371 U.S. 236, 240, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963); *United States ex rel. Schonbrun v. Commanding Officer, Armed Forces*, 403 F.2d 371, 373 (2d Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969). The petitioner originally sought to obtain a writ of habeas corpus from the United States District Court for the Western District of Texas. That court dismissed the petition without reaching its merits, evidently because it lacked personal jurisdiction over the custodians of the petitioner. *McCracken v. Brown*, No. SA–80–CA–105 (W.D.Tex. March 19, 1980). This court's jurisdiction has not been questioned; the commanding officer of the USS Fulton, to which the petitioner is assigned, is a resident of Connecticut. *See generally Strait v. Laird*, 406 U.S. 341, 344–36, 92 S.Ct. 1693, 1695–96, 32 L.Ed.2d 141 (1972); *Schlanger v. Seamans, supra*, 401 U.S. at 490–92, 91 S.Ct. at 997–98.

After a hearing on McCracken's petition, held on September 22, 1980, and consideration of the parties' proposed findings of fact and briefs, the court concludes that: any misrepresentations concerning training which the recruiter made to McCracken created no contract between the petitioner and the Navy; the written agreement for the extension of the term of McCracken's enlistment is the only contract governing the Navy's obligations to McCracken; and the Navy has fulfilled its obligations to the petitioner under that contract. Accordingly, the petition is denied. Judgment shall enter for the respondents, dismissing McCracken's petition and complaint for other relief.[2]

## I. FACTS

### A. *McCracken's Enlistment and Extension Agreement*

In September 1975, McCracken went to a Navy recruiting office in San Antonio, Texas. There he spoke with Petty Officer Guadalupe Lopez, a Navy recruiter.[3] McCracken took several tests to determine the programs and jobs for which he might qualify, and was told, after his tests had been scored, that he could undertake any training program other than the nuclear program.[4] He then discussed a number of courses of training with Lopez.[5] McCracken was interested in the Advanced Technical Field ("ATF") program; Lopez talked about this program with McCracken, and

showed him several pamphlets and the portion of the Navy recruiting manual which described it.[6]

The petitioner recalled, at the hearing on his petition, that he read chapter 26 of the manual, concerning the ATF program; he was particularly interested in the communications training, which offered as options satellite communications, communications technical control and cryptographic equipment repair.[7] The manual–which circumscribes the authority of Navy recruiting officers [8]–does not state that a recruit who participates in the ATF program is guaranteed two years of schooling in return for an additional two years of time as an enlisted man.[9] To the contrary, the manual makes only the following limited guarantee about training: [10]

Enlistees in this program will be guaranteed only a specific "A" school (PHASE I training) with ultimate assignment to follow–on training (PHASE II) contingent upon satisfactory completion of "A" school *with a standing in upper one–half of class* and with the specific phase assignment based on current needs of the Navy in the ATF program. Personal desires of the individual will be considered in connection with the available training.

The recruiting manual which McCracken read makes no representations about the usefulness of Navy ATF schooling for jobs outside the military. Nor does it promise more than approximately 34 hours of train-

---

2. In addition to a writ of habeas corpus, McCracken has prayed for a declaratory judgment under 28 U.S.C. § 2201, establishing his entitlement to an honorable discharge; a writ of mandamus under 28 U.S.C. § 1361, directing that he be discharged from the Navy; and attorney's fees and costs. *See* Petition for Writ of Habeas Corpus, Complaint for Mandamus and Declaratory Relief, ¶¶ V.2–V.5. The court's conclusions on the legal issues presented by the petition for a writ of habeas corpus are equally applicable to the petitioner's prayer for ancillary relief.

3. Transcript of Hearing on Petition for Writ of Habeas Corpus ("Tr.") 17, 57.

4. Tr. 17–18; *see* Tr. 57–58. McCracken testified that he was ineligible for the nuclear program because he had not completed 12 consec-

utive years of school, although he had a high school diploma. Tr. 17–18.

5. Tr. 18.

6. Tr. 21–22, 46, 58–59. Chapter 26 of the recruiting manual, which covers the ATF program, was introduced at the hearing as Respondents' Exhibit A.

7. Tr. 46.

8. In the words of Petty Officer Lopez, recruiters "can't move without the manual." Tr. 160.

9. Tr. 160. *See generally* Respondents' Exhibit A.

10. *Id.* at 26–5 (emphasis in original).

ing for enlistees who, like McCracken, train for positions in the "General Service communications area, afloat and ashore," as opposed to those who undertake submarine duty:[11]

d. *Radioman (RM).* There are two alternative routes in the RM ATF PHASE II training; *one leads to advanced technical training (Class "C" school) in the General Service communications area, afloat and [a]shore.* The other requires that candidates be volunteers for submarine duty, with advanced training offered in several areas relating to communications equipment operation and maintenance. *PHASE I consists of basic RM "A" school training and includes both ship and shore training in addition to communication basic (approximately 18 weeks).*

PHASE IIA Schools—General Service preparatory training in Basic Electricity and Electronics (BE&E) plus Class "C" school training leading to qualifications in any one of several technical areas such as Satellite Terminal Operator, Teletype Repair Technicians, or Automated/Fleet Satellite Communication Systems Operator (approximately 16–36 weeks in duration).

PHASE IIB Schools—Submarine service training leading to one of the five operator/repairman tracks, including 16 weeks of training in Electricity/Electronics. Applicants must be eligible for and a volunteer for submarine duty. (Approximately 38–42 weeks in duration depending on track selected).

e. *Training Cycle.* Personnel will be transferred from one phase of the training cycle to the next without undue delays. The normal training cycle for ATF personnel is as follows:

(1) Recruit Training

(2) Class "A" School

(3) Advanced Training . . . .

McCracken left the recruiting office with the impressions—which he ascribes to things Lopez told him and to statements in the pamphlets which he read—that under the ATF program a recruit enlists for a four–year term and agrees to a two–year extension of that term, and that in exchange for the additional two–year service obligation the Navy offers two years of training, followed by a guarantee of four years of actual work experience in the field of the enlistee's training.[12] Moreover, McCracken testified that Lopez had "assured" him that the communications equipment used by the Navy was the latest available.[13] Finally, McCracken testified that Lopez told him that participation in the ATF program would give McCracken valuable training which would be useful in obtaining a civilian job after he had completed a six–year stint in the Navy.[14]

McCracken's testimony is at variance with that of Lopez. Although Lopez testified that he did not specifically recall his 1975 conversations with McCracken,[15] he expressly denied that he ever represented to any recruit that ATF trainees were guaranteed two years of schooling, any particular placement after training, or anything else not sanctioned by the recruiting manual.[16]

Although McCracken was interested in the ATF program in September 1975, he did not enlist in the Navy then, because Lopez told him that there were no ATF openings

---

11. *Id.* at 26–7 to 26–8 (emphasis added).

12. Tr. 20–21.

13. Tr. 21.

14. Tr. 22.

15. Tr. 141. The inability of Lopez to recall specifically his talks with McCracken is understandable; not only had nearly five years passed between those discussions and Lopez' testimony in this court, but Lopez had seen hundreds of potential recruits in similar circumstances during that time. *See* Tr. 139–140 (Lopez saw 7 to 10 potential enlistees a day, and had been working as a recruiter since March 1974). There are no records of the Lopez–McCracken meetings, apparently because the Navy recruiting office in San Antonio has a practice of destroying records of contacts with potential recruits after two years. *See* Tr. 144.

16. Tr. 160–61.

at that time.[17] McCracken waited until November 1975, when he returned to the recruiting office and told Lopez that he was ready to enlist; Lopez determined that there were still no openings in the ATF program, and informed McCracken of this fact.[18] The petitioner then elected to join the Navy under a standard four–year enlistment contract, without provision for special training and without any special guarantee; under this agreement, McCracken entered the Navy in the E–1 pay grade.[19] McCracken read and voluntarily signed this agreement on November 21, 1975.[20]

The petitioner reported to basic training (or "boot camp") at the Great Lakes Naval Station in Illinois. There, new recruits routinely were brought before Navy "classifiers" who reviewed their files (including the recruits' scores on the tests administered to them prior to enlistment), confirmed the classifications (if any) made at the time of enlistment, and described to the recruits their qualifications for special types of training or work.[21] McCracken met such a "classifier" on December 15, 1975.[22] The "classifier" asked the petitioner what he wanted to do in the Navy and reviewed McCracken's file; McCracken told him that he was interested in the ATF program, which had been explained to him by his recruiter in San Antonio.[23] The "classifier" then told McCracken that there were openings in the ATF program, and that if he

still wanted to enroll in that program, he could do so.[24] McCracken evidently reaffirmed his desire to undertake ATF training,[25] and the "classifier" typed up an agreement extending the period of the petitioner's enlistment for an additional two years and classifying him for the ATF program.[26] McCracken read and voluntarily signed the agreement to extend the term of his enlistment on December 15, 1975.[27]

The agreement which McCracken signed is a one–page document, which states as the reason for the extension of his enlistment his desire for ATF training and accelerated advancement to pay grade E–4, as described in chapter 26 of the Navy recruiting manual.[28] The agreement further states that the petitioner understands that the extension contract is binding upon its execution and may not subsequently be cancelled, except as provided in Article 1050150 of the Bureau of Naval Personnel Manual ("BUPERSMAN").[29] McCracken also agreed to the understanding that "when I accept accelerated advancement to E–4 this agreement may not be cancelled whether or not I complete advanced training." [30]

The operative provisions of the agreement to extend McCracken's term of enlistment were the following: [31]

FIRST: I, Gary Lee McCracken, having enlisted in the United States Navy ... on 75 NOV 21 [sic], for 4 years do hereby voluntarily agree to ... extend my en-

17. Tr. 19.

18. Id. See also Tr. 65–66.

19. Tr. 19, 66; Petitioner's Exhibit 2, p. 1.

20. Petitioner's Exhibit 2; Tr. 62–63.

21. See Tr. 150–51, 155–58. This is apparently consistent with standard Navy practice. See generally United States ex rel. Roman v. Schlesinger, 404 F.Supp. 77, 83 (E.D.N.Y.1975).

22. Tr. 23.

23. Tr. 23–24.

24. Tr. 24.

25. See Tr. 79. The petitioner's understanding was "that for two extra years I get two years of training." Id. Presumably, this impression was the result of his conversations with Lopez. See Tr. 62, 77–78.

26. Tr. 24.

27. Tr. 62, 79; Petitioner's Exhibit 1.

28. The agreement refers to the recruiting manual as "CRUITMAN–ENL." Petitioner's Exhibit 1. That designation–which is the Navy's somewhat Orwellian term for the recruiting manual for enlistees–appears on the cover of that manual. See Respondents' Exhibit A.

29. Petitioner's Exhibit 1.

30. Id.

31. Id. The agreement was signed by McCracken and witnessed by W. G. Chenoweth, Assistant Personnel Officer.

listment for a period of 24 months from its date of expiration. This is the 1st extension of my current enlistment.

*SECOND*: Having reread my current enlistment contract signed on 75 NOV 21 [sic], I agree that this voluntary agreement shall be subject to provisions and obligations of the contract and shall become a part thereof. I acknowledge that the provisions of 10 U.S.C. [§] 5540 relating to an increase in basic pay do not apply to this voluntary extension of enlistment.

*THIRD*: I have had this voluntary extension agreement fully explained to me, I understand it, and *certify that no promise of any kind has been made to me except as stated above.*

And I do further swear (or affirm) that all statements made by me as now given in this record are correct.

### B. *McCracken's Training and Service in the Navy*

McCracken received training in the ATF program which was consistent with the description of that program in chapter 26 of the Navy recruiting manual which he had read in the San Antonio recruiting office.[32] After he completed his basic training as a recruit, McCracken attended a Class "A" radioman's school. In this school (which is attended by all Navy radiomen) he received 16 weeks of fundamental instruction basic to the duties of a radioman.[33] Upon his graduation from this course of study, he was promoted to the E–4 pay grade.[34]

The next Navy school which the petitioner attended was the Basic Electronics and Electricity Preparatory School.[35] There, he received eight weeks of basic instruction in electrical and electronics theory similar to that covered in a comparable junior college course.[36]

McCracken was then assigned to the Radioman "C–7" Service School.[37] There, he was given instruction in leadership, management and instructional skills, along with some electronics theory. At this school, the Navy trained senior petty officers–*i. e.*, those in pay grades E–5, E–6 and E–7–performing the duties of radiomen to lead, supervise and teach those serving under them.[38] The petitioner spent 16 weeks in that school,[39] which appears to be a Class "C" school within the meaning of chapter 26 of the Navy recruiting manual.[40]

Finally, McCracken attended a 6–week program at the "AN/SGA–3 Maintenance" school, in which the maintenance of cryptographic equipment was taught. The petitioner was trained on a "KLB–47" electro–mechanical coding machine. This equipment, which dates to the 1940s, is not electronic, but–like teletype machines–contains a variety of mechanical operating parts (e. g., cams, gears and drive mechanisms). The training which the petitioner received in this school, as well as his Basic Electronics and Electricity course, was of commercial value, in that it imparted skills useful in civilian employment.[41]

The "AN/SGA–3 Maintenance" course was the final course taken by McCracken as part of the ATF program. Upon complet-

---

**32.** Respondents' Exhibit A, pp. 26–5 to 26–8. *See* text *supra* at notes 10–11.

**33.** *See* Stipulation of Fact, filed Oct. 30, 1980 ("Stipulation") ¶ 4; Tr. 26–27. Although the Navy recruiting manual states that this course lasts for "approximately 18 weeks," Respondents' Exhibit A at 26–7, enlistees are graduated from it as quickly as they master the material taught (in McCracken's case, 16 weeks); there is no fixed amount of time for completing this course. *See* Tr. 27.

**34.** Tr. 79; Stipulation ¶ 9.

**35.** Tr. 27.

**36.** Stipulation ¶ 5; Tr. 28, 108.

**37.** Tr. 28.

**38.** Tr. 28–29.

**39.** *See* Stipulation ¶ 6; Tr. 29, 104.

**40.** The manual specifies that radiomen who do not volunteer for submarine duty attend, after the completion of the basic Class "A" school, the Basic Electricity and Electronics course followed by a Class "C" school. *See* Respondents' Exhibit A, p. 26–7.

**41.** Tr. 30, 105, 107–08.

ing approximately 46 hours of training in that program—more than the minimum amount of time reflected in the description of the ATF program in the Navy recruiting manual [42]—the petitioner was assigned to the USS Fulton, which is based in New London, Connecticut. McCracken joined the Fulton's crew in February 1977, classified as a teletype repairman.[43] In his first two or three months on the Fulton he was engaged in "preventive maintenance" work.[44] He then was assigned to be a "junior watchstander," performing the general communications duties of a radioman, including sending, receiving, and filing messages, checking traffic and destroying classified materials.[45] He was next made a "senior watchstander," in charge of the other watchstanders who work in rotations, manning the ship's watch station 24 hours a day.[46] Although he had the designation of teletype repairman, the petitioner never repaired a teletype machine or gave any instructions to anyone concerning the repair of such a machine.[47]

After approximately a year and a half on the Fulton, the petitioner began complaining that he had not received sufficient schooling in the ATF program.[48] He learned that the Navy offered training on

cryptographic equipment more advanced than the electro–mechanical coding machine on which he had been trained and requested such schooling.[49] This request was denied, apparently because McCracken's background in electronics was not sufficiently extensive for him to begin that kind of advanced training; in order to obtain the electronics background necessary for the schools in which he wanted to enroll, McCracken would have had to train to be a submarine radioman at the Naval Submarine Base in Groton.[50] The Navy counselors with whom McCracken had talked while he was in the Class "A" radioman school had asked him whether he wished to serve on a submarine—which he evidently did not choose to do—but did not explain to him that choosing submarine service in the ATF program would have enabled him to get more advanced training than he could otherwise receive.[51] This fact was, however, spelled out in the chapter of the Navy recruiting manual which McCracken read before enlisting and which constitutes the definitive description of the ATF program.[52]

McCracken complained about the Navy's failure to give him the education and experience which he had expected in a letter,

---

**42.** *See* Respondents' Exhibit A, p. 26–7 (minimum training of approximately 34 weeks for non–submarine radiomen).

**43.** Tr. 31.

**44.** *Id.*

**45.** Tr. 33.

**46.** Tr. 32–33.

**47.** Tr. 32.

**48.** Tr. 34–35.

**49.** Tr. 34, 71.

**50.** Tr. 34. Chapter 26 of the Navy recruitment manual—which McCracken read before enlisting, and which is incorporated by reference in his agreement to extend his enlistment, *see* Petitioner's Exhibit 1—makes clear the differences between the ATF training received by non–submarine radiomen (such as the petitioner) and those who volunteer to serve as radiomen on submarines. The former take courses "in the General Service communications area, afloat and ashore," while the latter receive "ad-

vanced training ... in [one of] several areas relating to communications equipment operations and maintenance." Phase II of the ATF program is divided into two sections: Phase IIA, for non–submarine radiomen, follows one course of study, taking approximately 16 to 36 weeks, while Phase IIB, for submarine radiomen, includes 16 weeks of training in electricity and electronics, followed by special submarine service training "leading to one of the five operator/repairman tracks"; the Phase IIB program lasts approximately 38 to 42 weeks. Participation in Phase IIB is expressly limited to those who are eligible for submarine duty and volunteer for such service. *See* Respondents' Exhibit A, pp. 26–7 to 26–8.

**51.** Tr. 72. McCracken contends that the effect of the silence of these counselors was to confirm the misinformation (that he would receive two years of advanced training on the latest equipment by enrolling in the course of study which he eventually undertook) given him by Lopez in the San Antonio recruiting office.

**52.** *See* note 50, *supra.*

dated September 11, 1979, addressed to the Chief of Naval Personnel.[53] In the letter, McCracken argued that the training he received was not really advanced technical training, and wrote:[54]

> I strongly feel that I have met my commitment and the U.S. NAVY has not met theirs and I am now requesting that I be released from the 24 Month extension I signed on 15 DECEMBER 1975.

After the Chief of Naval Personnel denied this request, McCracken wrote to Congressman Tom Loeffler of Texas, "again requesting that the U.S. Navy either uphold their [sic] obligation and provide me with the opportunity to complete advanced technical training or expedite my discharge."[55]

By December 1979, McCracken was so disillusioned that he no longer felt a part of the Navy; as he testified in this court, "I considered myself a civilian, with all the rights and the privileges of a civilian of this country."[56] He left his duty station in Connecticut on January 1, 1980, without authorization and returned home to Texas.[57] There he consulted an attorney and filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Texas; that court dismissed the petition without prejudice for lack of jurisdiction.[58] In March 1980, McCracken voluntarily surrendered to military authorities, who returned him to the Fulton; he was court–martialled for being absent without authority since the beginning of the year.[59] McCracken has remained with the Fulton since March, and is still on duty on that vessel.[60]

## II. THE LEGAL ISSUES

Before turning to the merits of the petitioner's claim, it is important to state the basic (and, indeed, obvious) principle that the court's role in reviewing the actions of the Navy must be a limited one. In a case involving another branch of the armed services, the Supreme Court observed that:

> [J]udges are not given the task of running the Army . . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed.842 (1953). The same is equally true of the court's role in

---

53. This letter, Petitioner's Exhibit 5, was written by McCracken, with the assistance of Lieutenant (j. g.) Thomas R. Poland. Tr. 36–38. Poland, who was the communications officer of the USS Fulton at that time, supervised McCracken. Tr. 100–01. Poland had attempted to get McCracken into submarine school and was generally sympathetic to McCracken's grievances until he talked to the Fulton's career counselor, who obtained from the archives McCracken's agreement to extend his enlistment; after learning about the nature of that agreement and the ATF program, Poland took the view that McCracken had, "in fact, received what he agreed to extend for." Tr. 119, 124.

54. Respondents' Exhibit 5, p. 2.

55. Tr. 39–40; Petitioner's Exhibit 9, p. 2.

56. Tr. 44–45.

57. Stipulation ¶ 10; Tr. 51; *see also* Petitioner's Exhibit 11 (notifying postal officer of the USS Fulton of his new address, in Lakehills, Texas).

58. *See* note 1, *supra.*

59. Stipulation ¶¶ 11–12; *see* Tr. 53. The petitioner, who filed this action on April 17, 1980, sought an order restraining the court–martial proceedings. The court denied the motion for such an order on May 28, 1980; the reasons for that decision are set forth in a memorandum of decision filed on June 5, 1980. The court martial trial was held on June 4, 1980. McCracken was found guilty and sentenced to 45 days of hard labor without confinement and a reduction in rank and pay, from the E–5 grade to E–4 status. Stipulation ¶ 12.

The Petitioner also sought an immediate honorable discharge by filing an application for correction of his naval record with the Board of Correction of Naval Records of the Department of the Navy; that application, filed on June 6, 1980, was denied on July 31, 1980. Petitioner's Exhibit 6; Stipulation ¶ 13; *see* Tr. 54. The respondents concede that the petitioner has exhausted his administrative remedies. *See* Tr. 12–13, 185–87.

60. *See* Tr. 17, 54.

this case. *See also Friedberg v. Resor*, 453 F.2d 935, 937 (2d Cir. 1971) (courts must "tread lightly on the military domain, with scrupulous regard for the power and authority of the military establishment to govern its own affairs within the broad confines of constitutional due process"); *Nixon v. Secretary of the Navy*, 422 F.2d 934, 939 (2d Cir. 1970) ("the day–to–day operations of the armed forces are best left to the military, and the courts should not play a role in reviewing the exercise of discretionary military decisions"); *cf. Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971) (Friendly, J.), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).

Notwithstanding the limited judicial role in this area, federal courts presented with a claim that a branch of the armed forces is unlawfully holding an enlistee in custody must determine whether the military has violated applicable statutes or regulations [61] and whether it has breached a contract with the enlistee.[62] The only suggestion by the petitioner that the Navy violated any law or regulation is his contention that the Navy was required to cancel the extension of his enlistment under article 1050150(9)(c) of BUPERSMAN. That regulation [63] provides that "when a member, through no fault of his own, has failed to receive any of the benefits for which the extension was executed," the commanding officer must cancel the agreement to extend the term of his enlistment. It further provides, by way of example, that if an enlistee has not received "any special program, for which he had agreed to extend ... or has not received any benefits therefrom," cancellation of the agreement is mandatory.

■ The petitioner's reliance on this regulation is, on the facts of this case, misplaced. The Navy has given McCracken the very program of education for which the extension agreement was executed–ATF schooling as a non–submarine radioman, as described in chapter 26 of the recruiting manual which McCracken read prior to enlisting.[64] Nor can it be said that he derived no benefits from this program; although the schooling he received did not fulfill McCracken's hopes, the court has found that his technical training in the Navy would be of some commercial utility to him after the conclusion of his military service.[65] *See Nixon v. Secretary of the Navy, supra*, 422 F.2d at 938 (Navy not obligated to cancel extension agreement where enlistee

---

61. See, e. g., *Johnson v. Chafee*, 469 F.2d 1216, 1218–19 (9th Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2146, 36 L.Ed.2d 686 (1973); *Friedberg v. Resor*, 453 F.2d 935, 937 (2d Cir. 1971); *Nixon v. Secretary of the Navy*, 422 F.2d 934, 939 (2d Cir. 1970).

62. See, e. g., *Pence v. Brown*, 627 F.2d 872, 874 (8th Cir. 1980); *Peavy v. Warner*, 493 F.2d 748, 750 (5th Cir. 1974); *Santos v. Franklin*, 493 F.Supp. 847, 851 & n.4 (E.D.Pa.1980); *United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77, 85 (E.D.N.Y.1975); *Bemis v. Whalen*, 341 F.Supp. 1289, 1291 (S.D.Cal.1972); *cf. United States v. Grimley*, 137 U.S. 147, 150–51, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *Caola v. United States*, 404 F.Supp. 1101, 1106 & n.11 (D.Conn.1975) (Blumenfeld, J.). Enlistment contracts are to be interpreted in accordance with federal law. *See Rehart v. Clark*, 448 F.2d 170, 174 n.2 (9th Cir. 1971); *Colden v. Asmus*, 322 F.Supp. 1163, 1164 (S.D.Cal.1971). The cases construing such contracts constitute an evolving body of specialized federal common law, developed in view of the strong federal interest in this area, *see United States v. Standard Oil Co.*, 332 U.S. 301, 305–06, 67 S.Ct. 1604, 1606–07, 91 L.Ed. 2067 (1947); *In re*

"*Agent Orange*" *Products Liability Litigation*, 635 F.2d 987 (2d Cir. 1980) (Feinberg, C. J., dissenting), and the need for uniformity in the interpretation of enlistment contracts. *See generally* Friendly, *In Praise of Erie–and of the New Federal Common Law*, 39 N.Y.U.L.Rev. 383 (1964).

63. The BUPERSMAN and BUPERSINST regulations have the force of law and are binding on the Navy. *See Rehart v. Clark*, 448 F.2d 170, 173 (9th Cir. 1971); *Caola v. United States*, 404 F.Supp. 1101, 1105 (D.Conn.1975).

64. McCracken also cites an addendum to BUPERSINST 1510.112, which describes Phase IIA of the ATF radioman training curriculum lasting 37 to 47 weeks. However, BUPERSMAN art. 1050300(5) makes clear that, in exchange for a two–year extension of an enlistment obligation, the Navy promises a total of only 34 or 35 weeks of instruction. McCracken received 46 weeks of training (of which approximately 30 weeks were in Phase IIA). *See* text *supra* at notes 32–41.

65. *See* text *supra* at note 41; Tr. 107–08.

received the schooling which the agreement contemplated). *Contrast Novak v. Rumsfeld*, 423 F.Supp. 971, 974–75 (N.D.Cal.1976) (petition for habeas corpus granted where enlistee was not given the opportunity to take any of the advanced technical courses which were part of the program for which he had enlisted). In this case, the Navy has not violated any obligation imposed upon it by statute or regulation.

The court therefore turns to the petitioner's contractual arguments. McCracken contends that Lopez' representations as to the length and nature of the ATF training for which the petitioner subsequently extended his term of enlistment bind the Navy, even though Lopez was not authorized to make the representations to which McCracken testified. He also relies upon the doctrine of equitable estoppel, under which he seeks to bar the respondents from denying the existence of a binding contract arising out of Lopez' representations, even if the law would not recognize those statements as the basis of a contract between McCracken and the Navy.

The notion that the Navy is contractually bound by Lopez' oral representations (as recounted in the testimony of the petitioner) is directly contrary to the principle, recently reiterated by the Court of Appeals for the Second Circuit, that the unauthorized statements of a government agent do not bind the United States. In *Doe v. Civiletti*, 635 F.2d 88 (2d Cir. 1980), our Court of Appeals held that the promises of a Special Attorney employed by the United States Department of Justice and an agent of the Drug Enforcement Administration to a witness subject to the federal Witness Protection Program did not bind the government, for neither the attorney nor the agent were authorized to make such promises. The court rejected the witness' contractual claim for damages:

> That [the attorney and agent] lacked the actual authority to bind the Government is fatal to Doe's suit, for *it is axiomatic that the United States is not bound by the unauthorized acts of its agents.*

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Undoubtedly, this "actual authority doctrine" may produce harsh results, and did so in *Merrill*–in which farmers whose crops were destroyed in a drought were denied reimbursement because the government agent who sold crop insurance to them was without actual authority to do so.…

In spite of its rigor, the actual authority doctrine has been scrupulously followed. *See, e. g., Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980); *Jackson v. United States*, 573 F.2d 1189 (Ct.Cl. 1978).

*Doe v. Civiletti, supra,* 635 F.2d at 96 (emphasis added).

In the *Jackson* case, cited by the Court of Appeals for the Second Circuit in *Doe*, the Court of Claims applied the "actual authority" doctrine to the claims of an Army enlistee who, like McCracken, sought to bind the military by a recruiter's unauthorized promise. In *Jackson*, the plaintiff contended that a recruiter had promised him that, if enlisted, he would not be required to participate in any "dangerous–combat–type" maneuvers or activities; any such representation was contrary to the terms of the plaintiff's written enlistment agreement and applicable regulations. The court held that he was obligated to fulfill the terms of the written contract, and that no representations made to the enlistee by his recruiter bound the government, since the enlistee had not proved that the recruiter was actually authorized to make them. *See Jackson v. United States, supra,* 573 F.2d at 1197. The instant case is similar in this regard to *Jackson*. Even if it is assumed that Lopez made the statements about the ATF program which McCracken

has ascribed to him, those representations create no contractual obligation or liability on the part of the Navy, for the petitioner has not proved that Lopez was authorized to make them.[66]

■ In an apparent effort to circumvent the "actual authority" doctrine, the petitioner invokes the theory of estoppel to support his claim that the respondents are bound by Lopez' alleged misrepresentations as to the length and nature of the training which the Navy was to provide McCracken. This argument must fail. In this Circuit,[67] the rule that oral misrepresentations by government employees do not create contracts by operation of the equitable principle of estoppel[68] is enforced except in the unusual circumstances of affirmative misconduct by a government official which results in the denial of benefits[69] or a misstatement by a government official concerning a purely procedural requirement which is so contrary to objective standards of conduct that it may be inferred that misconduct has occurred.[70]

■ The "affirmative misconduct" exception to the rule against estopping the government is not applicable here. In this circuit, that exception was established in *Corniel–Rodriguez v. Immigration & Naturalization Service*, 532 F.2d 301 (2d Cir. 1976). There, the court was concerned with the failure of the American consul in Santo Domingo, Dominican Republic, to warn an alien (as he was required to do by State Department regulations) that her visa for entry to the United States would automatically become invalid if she married before arriving in the United States. Since the alien—who had no reason to know of this provision of our immigration laws—was not advised of this fact by the consul, she married her childhood sweetheart just three days before leaving the Dominican Republic for this country. The court held that in these circumstances, the failure of the consul to do what he was affirmatively required to do by State Department regulations constituted such misconduct that the government could not resort to the "harsh sanction" of deportation. *Corniel–Rodriguez v. Immigration & Naturalization Service, supra,* 532 F.2d at 306.

Where a claim of such affirmative misconduct is made in support of an attempt to estop the government, "[t]he equities must always be carefully weighed in the context of the particular facts." *Corniel–Rodriguez v. Immigration & Naturalization Service, supra,* 532 F.2d at 306. The facts of this case, unlike those of *Corniel–Rodriguez,* do not support the application of estoppel. Unlike the plaintiff in *Corniel–Rodriguez,* who was "a naive and poorly education alien," 532 F.2d at 306, the petitioner here

---

**66.** The burden of proof on the issue of actual authority is on the petitioner who would bind the United States by the statement in question. *See Jackson v. United States,* 573 F.2d 1189, 1197 (Ct.Cl.1978). In this case, the petitioner has introduced no evidence establishing such authority, and the court has found that Lopez was not authorized to make representations about ATF training which were beyond the scope of, or contrary to, the description in chapter 26 of the Navy recruiting manual. *See* note 8, *supra,* and accompanying text.

**67.** The rule may be otherwise in other circuits. For example, in *Santos v. Franklin,* 493 F.Supp. 847 (E.D.Pa.1980), the principles of estoppel were applied to bind the Navy to a misrepresentation made to an enlistee in an official document. The court reached this result under the law of the Third Circuit, which, it held, authorized estoppel of the government where its application is necessary to avoid "manifest justice." *See Santos v. Franklin, supra,* 493

F.Supp. at 852 & n.6, *quoting Walsonavich v. United States,* 335 F.2d 96, 101 (3d Cir. 1964) and *Ritter v. United States,* 28 F.2d 265, 267 (3d Cir. 1928). This court does not read the leading Second Circuit case, *Hansen v. Harris,* 619 F.2d 942 (2d Cir. 1980), as approving any such open–ended exception to the rule against estopping the United States by the acts or statements of its agents.

**68.** *See Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 383–84, 68 S.Ct. 1, 2–3, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917).

**69.** *See Corniel–Rodriguez v. Immigration & Naturalization Service,* 532 F.2d 301, 306–307 (2d Cir. 1976).

**70.** *See Hansen v. Harris,* 619 F.2d 942, 949 (2d Cir. 1980).

is a high school graduate who impressed the court during his testimony as an articulate and intelligent young man. Unlike the plaintiff in *Corniel–Rodriguez*, who had no alternative but to rely upon the consul's silence, McCracken read the official manual which accurately described the ATF program in which he intended to enroll, and if he had any doubt as to the authoritative nature of the manual could have asked his recruiter specific questions about it. Finally, even if Lopez made the misrepresentations alleged, and thus exceeded the scope of his authority, he would not have engaged in such egregious and affirmative misconduct as the consul in *Corniel–Rodriguez*, who violated regulations requiring him to inform would–be immigrants of an important (although not self–evident) facet of our immigration laws.[71]

Equally inapposite to the facts of this case is the other narrow exception to the rule against estoppel which has been recognized by our Court of Appeals. In *Hansen v. Harris, supra*, the court held, over Judge Friendly's dissent, that a claimant for government benefits who justifiably relies upon a misrepresentation about the benefits program made by a government employee may in some circumstances be entitled to assert an estoppel against the United States. However, as Judge Oakes observed in his opinion for the court, the

> holding of estoppel under these circumstances is limited to the situation where (a) a procedural not a substantive requirement is involved and (b) an internal procedural manual or guide or some other source of objective standards of conduct exists and supports an inference of misconduct by a Government employee.

*Hansen v. Harris, supra*, 619 F.2d at 949. Judge Newman, concurring, emphasized that the court's holding was limited to cases

where "conduct of a government official has precipitated a procedural default" by a claimant. *Id.* at 960 (Newman, J., concurring). In Judge Newman's words,

> [i]n the context of determining when it is appropriate to consider the Government estopped by the conduct of its agents, the distinction can sensibly be drawn between substantive policy, which concerns definition of the class to whom benefits are extended, and procedure, which concerns the method by which any one person establishes eligibility.

*Id.* at 962 (Newman, J., concurring).

The distinction drawn in *Hansen* between substance and procedure is a somewhat elusive one. *See Hansen v. Harris, supra*, 619 F.2d at 957 (Friendly, J., dissenting); *cf. Guaranty Trust Co. v. York*, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). However, as Judge Newman's concurring opinion in *Hansen* makes clear, the distinction is a logical one in determining whether the United States should be equitably estopped. Where, as in *Hansen*, a claimant for benefits is eligible for them under the substantive statutes and regulations, but is denied such benefits because of misrepresentations made by a government employee as to procedure, estoppel serves the public policy which defined the claimant to be part of the class entitled to such benefits. In such cases, a substantive policy of the federal government would be frustrated unless the government were estopped from asserting the "procedural default" for which it was responsible. *Hansen v. Harris, supra*, 619 F.2d at 959–60 (Newman, J., concurring). However, where the party claiming benefits by estoppel would not otherwise be entitled to them under the relevant program, no federal substantive policy would be furthered by binding the government to the unauthorized representations of government employees.

---

**71.** The rule of *Corniel–Rodriguez* has expressly been limited by our Court of Appeals to cases in which a government employee or officer violated a regulation, which had the force of law, requiring him to do something. *Goldberg v. Weinberger*, 546 F.2d 477, 481 n.5 (2d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977). *See Hansen v. Harris*,

619 F.2d 942, 952 (2d Cir. 1980) (Friendly, J., dissenting). The petitioner has not established that the representations which, he alleges, Lopez made, while undoubtedly contrary to the Navy recruiting manual and therefore unauthorized, were made in violation of any mandatory regulation having the force of law.

To the contrary, society's "overarching interest in the substantive policies established by its government," *Hansen v. Harris, supra,* 619 F.2d at 959 (Newman, J., concurring), would be harmed by applying estoppel in such cases. Where matters of substance are implicated, "[t]he government could scarcely function if it were bound by its employees' unauthorized representations." *Goldberg v. Weinberger,* 546 F.2d 477, 481 (2d Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977) (rejecting estoppel claim against government). This is a particularly important concern in cases involving the military; judicial decisions permitting enlistees to bind the government by the unauthorized misrepresentations of recruiters or other low-ranking officers on matters central to the training and functioning of the armed forces could lead to a chaotic patchwork of individualized enlistment contracts, at variance with military policy, created on an *ad hoc, post hoc* basis by federal courts.

The petitioner argues not that Lopez misrepresented anything about the procedure to be followed for obtaining technical education in the Navy, but only that he misstated the substantive benefits which one could receive from signing up for the ATF program. Viewed in light of the dichotomy between substance and procedure established in *Hansen,* any misstatement made by the recruiter concerned the former, rather than the latter. Accordingly, the limited exception to the principle that the government may not be estopped by its agents' representations recognized in *Hansen* offers no comfort to McCracken. The court declines the petitioner's invitation to construe broadly the limited exceptions to the rule against estoppel established in *Corniel-Rodriguez* and *Hansen.* It would be particularly inappropriate to expand those narrow exceptions in the context presented here, for, as noted previously, it is not the court's business to run (or second-guess the daily operations of) the Navy.

The claim that Lopez' misrepresentations gave rise to a contract which McCracken may enforce against the Navy is, for the reasons stated above, without merit. Accordingly, the nature and extent of the Navy's obligations to McCracken (as well as his responsibilities to the Navy) are to be determined solely by reference to the written agreement extending the term of McCracken's enlistment. As the court has found, McCracken voluntarily signed that agreement–in which, incidentally, he certified that "no promise of any kind" had been made to him except as stated therein [72]–on December 15, 1975. The agreement obligated the Navy to provide McCracken with ATF training, as that program is described in chapter 26 of the Navy recruiting manual. It also recited the petitioner's understanding that the extension agreement was binding upon execution and was not subject to cancellation, except as provided in BUPERSMAN Article 1050150,[73] upon the petitioner's acceptance of acceleration to E–4 pay status.

In exchange for the Navy's commitments concerning training, pay, and conditions (as stated in the written agreement), McCracken agreed to serve an additional 24 months in the Navy, after the completion of his initial four–year tour of duty. On the facts found by the court,[74] it is evident that the Navy has fulfilled its part of this agreement. McCracken has given the court no

---

**72.** This statement is contradicted by McCracken's testimony that Lopez made numerous promises to him concerning the ATF program. However, because the written contract executed on December 15, 1975, is not ambiguous as to the Navy's obligations to provide training to McCracken, such parol evidence may not be relied upon to alter the express terms of the agreement extending the term of the petitioner's enlistment. *See Dubeau v. Commanding Officer, Naval Reserve Center,* 440 F.Supp. 747, 749 (D.Mass.1977).

**73.** That regulation, which provides for mandatory cancellation of enlistment extension agreements in certain circumstances, has no application to this case. *See* text *supra* at notes 63–65.

**74.** *See* text *supra* at notes 32–52.

adequate reason why he should not be required to live up to his half of the bargain.[75]

### Conclusion

As stated in detail above, the court has concluded that, on the facts of this case, the Navy violated no law, regulation or enforceable contract in connection with McCracken's extension of the term of his enlistment. Accordingly, his claim is without merit. In reaching this conclusion, the court has necessarily engaged in a searching review of the conduct of naval officers performing their military duties; however unsuited the judicial function is to intervention in military affairs (and however great the amount of deference due the military), federal courts are nonetheless required to examine with care claims such as McCracken's. After thorough review of the record developed herein and the written and oral presentations of counsel, the court is satisfied that the Navy has met all of its obligations to the petitioner, and that he is not entitled to the relief which he seeks.

Accordingly, McCracken's petition for a writ of habeas corpus is denied. The Clerk shall enter judgment for the respondents, dismissing with prejudice the petition and complaint for ancillary relief. It is so ordered.

This memorandum and order shall constitute the court's findings of fact and conclusions of law. *See* Rule 52(a), Fed.R.Civ.P.

---

**75.** Because McCracken has not established that the Navy breached any contract which he may enforce against it, the court need not reach the question whether rescission is an appropriate remedy in cases where military enlistment agreements are breached. *See generally Peavy v. Warner,* 493 F.2d 748, 750 (5th Cir. 1974); *United States ex rel. Roman v. Schlesinger,* 404 F.Supp. 77, 86–87 (E.D.N.Y.1975); *Matzelle v. Pratt,* 332 F.Supp. 1010, 1012 (E.D.Va.1971).